

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-13-1081

| | |
|---|---|
| DANIEL FORD | **Opinion Delivered** April 9, 2014 |
| APPELLANT | |
| V. | APPEAL FROM THE YELL COUNTY CIRCUIT COURT, DARDANELLE DISTRICT [NO. 75NJV-09-42] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES and MINOR CHILD | HONORABLE TERRY SULLIVAN, JUDGE |
| APPELLEES | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Daniel Ford appeals the September 2013 order of the Yell County Circuit Court that terminated his parental rights to his medically fragile four-year-old daughter, AP, born in August 2009. Ford argues that the trial court clearly erred in finding that there was clear and convincing evidence (1) that termination of his parental rights was in AP's best interest and (2) that DHS established the "other factors or issues" ground. The biological mother does not appeal the trial court's termination of her parental rights. The Department of Human Services ("DHS") and the child's attorney ad litem filed a joint appellee brief, asserting that termination of Ford's parental rights to AP was correct and should be affirmed. After conducting a de novo review, we are not left with a distinct and firm impression that a mistake was made in this instance. We affirm the trial court's findings as not clearly erroneous.

We review termination-of-parental-rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Supp. 2013); *M.T. v. Ark. Dep't of Human Servs.*, 58 Ark. App. 302, 952 S.W.2d 177 (1997). In making a "best interest" determination, the trial court is required to consider two factors: (1) the likelihood that the child will be adopted, and (2) the potential of harm to the child if custody is returned to a parent. *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1. Adoptability is not an essential element but is rather a factor that the trial court must consider. *Id*. Likewise, the potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703. The potential-harm analysis is to be conducted in broad terms. *Id*. It is the "best interest" finding that must be supported by clear and convincing evidence. *Id*.

Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). Credibility determinations are left to the fact-finder, here the trial court. *Moiser v. Ark. Dep't of Human Servs.*, 95 Ark. App. 32, 233 S.W.3d 172 (2006).

The intent behind the termination–of–parental–rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2013). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *Cole v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 203, 394 S.W.3d 318; *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1. A parent's past behavior is often a good indicator of future behavior. *Stephens v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 249, __ S.W.3d __.

With this legal framework, we examine the course of events in this DHS case. Other than the few weeks in the hospital following her birth, AP was in DHS custody her whole life. AP was born to a homeless, unstable mother in Little Rock, Arkansas, at the UAMS hospital. AP was transferred to Arkansas Children's Hospital to meet her medical needs. AP was born with microencephaly (a consequence of gestational exposure to a virus known as "CMV"), ventriculomegaly, an underdeveloped brain, a defect in the corpus callosum, and scoliosis. DHS took emergency custody of AP in late August 2009, when AP was due to be discharged from Children's Hospital. AP was then transferred to Arkansas Pediatric Facility ("APF") in North Little Rock, Arkansas, which provides constant nursing and rehabilitative care for children such as AP.

AP was adjudicated dependent–neglected in October 2009 based on the mother's instability, her history with DHS, her homelessness, and the child's serious needs. The goal was set as reunification. Testimony indicated that Ford, who lived in an apartment in Springdale with his mother, was the father of AP. He was not married to the biological mother.

The case was set for review in January 2010, after which Ford was ordered to complete parenting classes, submit to a psychological evaluation, cooperate with DHS, and attend anger–management classes. The case was set for another review in May 2010. The biological mother had absented herself and never appeared before the trial court in this case at any point.

By May 2010, Ford was found to be in compliance with the case plan and court orders, but AP was less than a year old and remained in very fragile condition. A permanency–planning hearing was set for August 2010, after which DHS retained custody of AP.

A fifteen–month–review hearing was conducted in November 2010. Ford had visited AP at the North Little Rock nursing facility on Saturday afternoons, but he was ordered to cooperate with DHS and not sleep during visits. Another permanency–planning hearing was conducted in June 2011. AP remained too medically fragile for Ford to care for her. Review and permanency–planning hearings were conducted in December 2011, May 2012, and November 2012. Over those months, the trial court recognized that Ford loved his daughter and had continued to exercise some Saturday afternoon visits with her.

In May 2013, the trial court changed the permanency goal to adoption or guardianship, permitting DHS to file a petition to terminate parental rights. DHS filed its petition in July

2013, asserting that Ford did not understand the severity of AP's medical issues or was indifferent to those issues, and that AP's health and safety would be in danger if Ford had custody and took her home, as was his desire. This "other factors or issues" ground cited by DHS is found at Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*:

> That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

The hearing on DHS's petition was conducted in August 2013. The evidence established that AP's profound developmental delays and medical needs required specialized around-the-clock care. At four years old, AP cannot walk, speak, or perform any self-care and is unlikely to develop those abilities. Her communication is limited to smiling or crying. She functions on the level of an infant. AP requires a wheelchair for mobility, which she cannot get in or out of or operate. AP requires an aspirator for respiratory support and a feeding tube for nutritional support. AP receives occupational, physical, and speech therapy. She will require future orthopedic surgeries to ease discomfort in her spine and extremities.

The evidence also established that Ford, a young man in his early twenties, lived with his mother, Lorie Ford, in an apartment in Springdale, Arkansas. Ford also had custody of his almost-two-year-old son from another relationship. Ford stated that he had worked for about a year at a local poultry plant in the hatching department, and before that, he took "odd and end jobs." He did not have a driver's license; he said his mother took him to work or he walked to work, which was down the street from their apartment.

Ford came to Little Rock to visit AP every other weekend in the first few years of AP's life, but in the last year, he visited her only three times. Ford testified that he thought he and his mother could care for AP in their home. He said that former medical staff at the nursing facility told him that AP could live at home, and he believed he could handle it. Ford stated that he worked all day long, but his mother would be home, and he thought he could take care of AP at night because, "I don't get no sleep anyway." Ford testified that he had no concrete plan for AP's care, but that he wanted custody so that he could take her home and get everything set up for her. He stated, "I see people in Springdale all the time with kids with holes in their throat and all kinds of problems with their kids and they got all the help they could possibly need." He believed that he could get nurses from a Fayetteville facility to come to his home to help periodically. Ford stated that he did not have any other witnesses on his behalf, other than his mother, because no one else thought he would get custody of AP. Ford testified that he had a letter reciting that he could care for AP, but he did not bring it to court. Ford stated that if there was a second medical opinion that AP needed to stay in a nursing facility, then he would abide by that opinion. Otherwise, he wanted AP at home.

Ford's mother testified that she was willing to be AP's guardian, but that she would take AP out of the nursing facility if she thought they were not providing appropriate care. She said that she did not know what AP's medical conditions were, but she thought that AP should come home, in part because she thought that AP was being neglected at the North Little Rock facility.

Terri Lovin, an administrator at the Arkansas Pediatric Facility, testified that she had been involved with AP's care throughout her stay there. She described AP's medical diagnoses and profound developmental delays and stated that AP was "totally dependent for all of her activities of daily living" on direct-care staff and always would require twenty-four-hour care. She said that AP needed a team of nurses, doctors, therapists, and direct-care staff, and that AP's future held many doctor's visits and orthopedic surgeries. Lovin opined that it would be very difficult to find constant in-home nursing care where Ford lived. Lovin said that despite the offer of training to Ford and his mother on how to safely feed AP, they did not demonstrate mastery of those skills. She was concerned about Ford's unrealistic expectations of AP, recalling him saying that AP did not crawl and walk because she was "lazy" or not exposed to children who could. Lovin said that Ford could not properly care for AP in his home, although Ford thought he could.

DHS supervisor and case worker Marie Lawrence testified that the goal of this case changed to adoption or guardianship when Ford's stated intent was to take AP home, against all advice that this was unwise and unsafe. Lawrence opined that AP was adoptable in spite of her severe medical and developmental needs, and she knew of three similar adoptions that had taken place, although it would be a challenge. On DHS's behalf, Lawrence urged termination of parental rights to give AP that opportunity, with adoption being preferred over guardianship. She stated that DHS policy required that AP not linger in DHS custody. The child's attorney ad litem agreed with DHS's recommendation to terminate Ford's parental rights.

The trial judge remarked from the bench that, after four years and despite the provision of rehabilitative services, Ford did not comprehend that he could not just take AP home. Ford left the courtroom in an emotional outburst. Subsequently, the trial court entered an order terminating Ford's parental rights. In that order, the trial court found that Ford demonstrated a lack of understanding as to the severity of his daughter's medical conditions accompanied by a belief that he could care for AP in his home against all medical evidence. This was the basis for the "other factors" ground that applied to Ford. The order recited that it would be in AP's best interest to terminate parental rights, the trial court having considered the testimony about the likelihood that AP would be adopted despite the severity of her medical diagnosis and the potential harm to AP if custody was given to Ford. The order also provided that Ford and his mother would be permitted continued visitation with AP if they behaved appropriately. Ford appealed this order.

Ford contends that the trial court's finding that the "other factors or issues" ground was established is clearly erroneous because Ford only "hoped" he could bring AP home some day. Ford adds that AP is unlikely to ever be adopted or to leave the medical facility, rendering termination of his parental rights not in the child's best interest.

This is an unfortunate and unique case. Ford's incapacity to understand the level of AP's needs and his failure to prepare for her needs meant that his parental rights had to give way to the child's need for permanency and safety. *See J.T. v. Ark. Dep't of Human Servs.*, *supra*. Ford's testimony reflected an apparent intent to take AP out of the nursing facility and to his home as soon as he had the right to do so. Termination of parental rights is an extreme

8

remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Pine v. Ark. Dep't of Human Servs.*, *supra*. Because we are not left with a distinct and firm impression that a mistake was made, we affirm the trial court's order.

Affirmed.

HARRISON and BROWN, JJ., agree.

*Didi H. Sallings*, Arkansas Public Defender Commission, for appellant.

*Elisabeth Murphy McGee*, DHS Office of Policy and Legal Services; and *Chrestman Group, PLLC*, by: *Keith Chrestman*, for appellees.