

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV–15–925

| | | |
|---|---|---|
| BOBBY JOE CALDWELL | | **Opinion Delivered** MARCH 2, 2016 |
| | APPELLANT | APPEAL FROM THE WHITE COUNTY CIRCUIT COURT |
| V. | | [NO. JV-14-195] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | | HONORABLE ROBERT EDWARDS, JUDGE |
| | APPELLEES | AFFIRMED |

**DAVID M. GLOVER, Judge**

Bobby Caldwell's parental rights to his son, C.C., born April 28, 2006, were terminated by the White County Circuit Court.[1] Caldwell appeals the termination, arguing that the trial court erred in finding that termination of his parental rights was in C.C.'s best interest due to a complete lack of credible evidence demonstrating the likelihood of adoptability and potential harm. We affirm.

*Facts*

The Department of Human Services (DHS) was contacted in August 2014 to assist in an interview of C.C. regarding allegations of sexual abuse. Although Caldwell had legal custody, C.C. had been in the custody of Mary Beck (C.C.'s paternal grandmother) since February 2014. In July 2014, it was reported that C.C. was being sexually abused by Beck,

---

[1]The parental rights of Ashlie Wood, C.C.'s mother, were also terminated in this order on the basis that Wood had signed a consent to terminate her parental rights. Wood is not a party to this appeal.

SLIP OPINION

who had allegedly placed drill bits into his anal area.  C.C. disclosed that Caldwell had previously sexually abused him in the same manner; he was also verbalizing suicidal and homicidal ideations and was physically aggressive toward Beck.  Beck appeared to be under the influence during C.C.'s interview, and when given a drug-and-alcohol screen, she tested positive for methamphetamine, THC, benzodiazepines, and alcohol.  Due to Beck's positive drug-and-alcohol screen and C.C.'s suicidal and homicidal ideations, DHS took a seventy-two-hour hold on C.C. on August 20, 2014.  DHS filed a petition for emergency custody and dependency neglect on August 25, 2014; an ex parte order of emergency custody was entered on August 26.  An order filed September 17, 2014, found probable cause to continue custody of C.C. with DHS; C.C. was then adjudicated dependent-neglected in an order filed October 6, 2014.  In the adjudication order, the circuit court found Caldwell had not fulfilled his parental responsibility to provide proper care and housing for C.C. by allowing C.C. to live with Beck, noting Beck's use of drugs, the sexual-abuse allegations, and C.C.'s homicidal and suicidal ideations.

On January 22, 2015, DHS filed a motion to terminate reunification services with Caldwell, arguing C.C. had been subjected to aggravated circumstances and asking for a determination that there was little likelihood services to the family would result in successful reunification.  In support of this request, DHS alleged C.C.'s mother had already consented to termination of her parental rights; Caldwell's address was unknown despite repeated requests by DHS; Caldwell, by his own report, was now unemployed; Caldwell had visited C.C. only once in five months; and Caldwell was doing nothing to try to have C.C. returned

to his custody. In a review order filed February 5, 2015, the circuit court continued custody with DHS; the order noted the filing of the motion for a no-reunification finding but continued the goal of the case as reunification. In the order, the circuit court noted the parents were not present for the hearing, they had not complied with the case plan, Caldwell's whereabouts were unknown, he was unemployed, and he had seen C.C. only one time during the five-month case.

Another review order was filed April 27, 2015. In the order, the circuit court changed the goal of the case from reunification to termination of parental rights with a goal of adoption. The circuit court also found by clear and convincing evidence there was little likelihood services to the family would result in successful reunification; specifically, the circuit court found Caldwell's whereabouts were unknown, he would not provide DHS with his address, he was not visiting C.C., and he had demonstrated a total lack of participation and cooperation in the case.

DHS filed a petition to terminate parental rights on April 29, 2015. After a hearing on August 3, 2015, the circuit court filed an order terminating parental rights on August 11, 2015. In that order, the trial court found DHS had proved by clear and convincing evidence it was in C.C.'s best interest that Caldwell's parental rights be terminated; the circuit court also found two statutory bases for terminating Caldwell's parental rights—that Caldwell had subjected C.C. to aggravated circumstances, Ark. Code Ann. § 9-27-341(b)(1)(B)(ix)*(a)* (Repl. 2015), and that other factors arose subsequent to the filing of the original petition for dependency-neglect that demonstrated that return of the juvenile to the custody of the parent

SLIP OPINION

was contrary to the juvenile's health, safety, or welfare, and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(1)(B)(vii)*(a)*.

*Standard of Review*

Termination–of–parental rights cases are reviewed de novo. *Schaible v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 541, 444 S.W.3d 366. To terminate parental rights, at least one statutory ground must exist,[2] as well as a finding that it is in the child's best interest for parental rights to be terminated; these must be proved by clear and convincing evidence. *Id.* In making a "best interest" determination, the circuit court is required to consider two factors: (1) the likelihood the child will be adopted, and (2) the potential harm to the child if custody is returned to a parent. *Ford v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 226, 434 S.W.3d 378. Clear and convincing evidence is that degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established; the appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* In resolving the clearly erroneous question, we must give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *McFarland v. Arkansas Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005).

---

[2] Caldwell does not challenge the statutory grounds for termination on appeal.



*Adoptability*

Caldwell first argues there is no evidence C.C. would be adopted, given his uncontrollable behavior and his caseworker's testimony that finding an adoptive home would be a challenge. While the likelihood of adoption must be considered by the circuit court, that factor is not required to be established by clear and convincing evidence. *Hamman v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 295, 435 S.W.3d 495. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Id.*

In support of his argument, Caldwell cites *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636, 378 S.W.3d 227, and *Lively v. Arkansas Department of Human Services*, 2015 Ark. App. 131, 456 S.W.3d 383. These cases are distinguishable from the facts of the present case. In *Grant*, the child in question was autistic, and the only evidence regarding his adoptability was from the adoption specialist, who was of the opinion the child was adoptable because she believed that all children were adoptable. In *Lively*, there was no evidence of adoptability presented at trial for the trial court to consider.

In the present case, Monica Pryor, C.C.'s caseworker, testified that, while C.C.'s adoptability was challenging, it was her opinion he was adoptable. She expounded upon her answer by explaining that C.C. was currently undergoing IQ and adaptive testing to specifically diagnose his behavioral issues, and once diagnosed and able to be treated with proper medications, he would be "good" for adoption. The circuit court found that while C.C. had some issues, it was likely he would be adopted, specifically relying on Pryor's testimony and determining that it was credible. Unlike *Lively*, in the present case there was

evidence presented to the trial court to consider in determining C.C.'s adoptability, and unlike *Grant*, the caseworker did not make a blanket statement that all children were adoptable, instead concentrating on C.C.'s specific circumstances and needs in giving her opinion that C.C. was adoptable.

*Potential Harm*

Caldwell also argues there was no proof of potential harm if C.C. was returned to his custody. In considering potential harm caused by returning the child to the parent, the trial court is not required to find that actual harm would result or affirmatively identify a potential harm. *Welch v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability of a permanent home. *Collins v. Arkansas Dep't of Human Servs.*, 2013 Ark. App. 90.

Caldwell points to the fact that the caseworker testified the potential harm in this case was the fact that C.C. had no diagnosis with regard to his behavioral issues and contends this reasoning is faulty because any adoptive parents would also not have the benefit of a diagnosis. Caldwell argues the same resources that would be "poured into" C.C. and a potential adoptive family could be used to help him with C.C. and possibly save C.C. from further harm.

This argument ignores the fact that the caseworker testified that C.C. would be at great risk for potential harm because Caldwell was not aware of what was happening with C.C. While Caldwell takes this statement to mean no one yet had a diagnosis for C.C.'s behavioral

issues, the evidence indicates that Caldwell was unaware of what was happening in C.C.'s life since DHS intervened and removed C.C. from Mary Beck's physical custody due to alleged sexual abuse and her drug and alcohol issues. It is notable that since the inception of the case, Caldwell visited C.C. only once; he had not completed any of the requirements set forth for him under the case plan; Caldwell had been living with his father for two months in Joplin, Missouri, at the time of the termination hearing; he was currently unemployed; he had no approved home for C.C. and no way to support C.C.; and Caldwell had taken no interest in C.C.'s medical diagnoses and treatment.

The circuit court's decision that it was in C.C.'s best interest for Caldwell's parental rights to be terminated was not clearly erroneous.

Affirmed.

ABRAMSON and HARRISON, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.