SLIP OPINION



Cite as 2016 Ark. App. 296

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV–15–1070

| | |
|---|---|
| CHANTELLE DOWDEN AND THOMAS MAYNARD<br><br>APPELLANTS<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN J.M. AND L.M.<br>APPELLEES | **Opinion Delivered** June 1, 2016<br><br>APPEAL FROM THE CLAY COUNTY CIRCUIT COURT, WESTERN DISTRICT [NO. WJV-2014-21]<br><br>HONORABLE CINDY THYER, JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

Chantelle Dowden and Thomas Maynard appeal from the Clay County Circuit Court order terminating their parental rights to their two minor children, J.M. (born 05/14/10) and L.M. (born 09/04/13). On appeal, Dowden and Maynard contend that the circuit court erred in terminating their parental rights because it did not properly consider their late compliance with the case plan and court orders. Dowden and Maynard do not challenge the statutory grounds for termination or the best-interest findings of the circuit court. We find no error, and we affirm.

### I. *Facts*

On July 17, 2014, an emergency order was entered placing J.M. and L.M. in the custody of the Arkansas Department of Human Services (the Department) after the Corning Police Department received a phone call reporting that J.M. had been observed outside the

home without supervision for the second time in two days. A family service worker visited the home and found it to be unsafe due to filthy conditions. The circuit court found that there was probable cause to remove the children from the custody of their mother, Chantelle Dowden, and that it was contrary to their welfare to be returned to the home. The father, Thomas Maynard, was not living in the home at that time. Both parents were ordered to complete background affidavits; cooperate with the Department; comply with the case plan; obey all orders of the court; keep in contact with the Department; notify the Department of any significant changes; participate in parenting classes; obtain clean, safe, stable housing; abstain from drug use and submit to testing; and provide proof of prescription medication. Dowden was ordered to submit to a psychological assessment, and Maynard was ordered to pay $100 per week in child support. The goal was set as reunification, and both parents were allowed weekly supervised visitation.

The Department was ordered to develop a case plan, provide services, and perform home studies of any relatives interested in the children.

An adjudication hearing was set for August 29, 2014, though due to Dowden's health issues, the hearing was continued until October 23, 2014. In the adjudication and disposition order that was entered the same day, the circuit court found that the Department had been involved with the family for about a month before the emergency petition was filed after a referral for inadequate supervision and guidance for appropriate housekeeping was made for the family. The circuit court found that the services provided during this month did not prevent the removal of the children from the home, because it was determined that the

conditions of the home had not improved. The circuit court found the children to be dependent-neglected because of environmental neglect and inadequate supervision. The circuit court found that returning the children to the custody of the parent was contrary to their health, safety, and welfare and that they should remain in the custody of the Department. The stated goal was reunification, and the parents were ordered to comply with the orders described in the emergency order. They were also ordered to keep the utilities turned on, and Maynard was ordered to find and maintain stable employment sufficient to support the family. Dowden was ordered to follow up with medical treatment, remain on her medication, and follow her doctor's instructions concerning physical therapy and rehabilitation. Maynard was ordered to establish paternity.

On June 3, 2015, the circuit court held a permanency-planning hearing and entered the permanency-planning order. In the order, the court found that adoption was appropriate and that the Department should file a petition for termination of parental rights. The circuit court found that Dowden and Maynard had only partially complied with the case plan. Specifically, the circuit court found that they had obtained housing, but when the caseworker visited the home in January and late February 2015, she found that it was still very dirty and unsafe. Dowden and Maynard moved to a different home after those home visits. Since then, the caseworker had attempted eighteen visits, but Dowden and Maynard had not been home. The circuit court also found that Dowden had applied for SSI benefits, but her application was still pending. The circuit court noted that Dowden had submitted to psychological testing, but she had not completed parenting classes.

SLIP OPINION

The circuit court also made findings concerning the visitations. Specifically, the circuit court found that Dowden had attended visitation and that she had done a better job of connecting with her children during the last three visits; however, the court found that Dowden was "inconsistent during visits." During the April 9, 2015 visit at McDonald's, Dowden had threatened to not come to see J.M. again if the child continued to visit the caseworker's table during the visitation. Dowden had also threatened to spank J.M. if she did not eat. The younger child had cried throughout the visit, and Dowden had screamed at L.M., Maynard, and J.M. and expressed her belief that the children were not paying enough attention to her. The visit had been cut short, and Dowden had followed the children and the caseworker out to the parking lot, still yelling.

The court also noted that "the family-service worker has concerns that Ms. Dowden is not able to care for the children without assistance. Ms. Dowden had not kept in contact with the Department as previously ordered by the court."

In the permanency-planning order, the circuit court made specific findings as to Maynard's partial compliance with the case plan. The circuit court found that Maynard had completed psychological evaluation and parenting classes and had attended supervised visitation, but that Maynard had not complied with the recommendations of the psychological evaluation. The inability to conduct home visits was attributed to Maynard as well as Dowden because he had, at some point during the pendency of the case, moved back in with Dowden. The circuit court found that Maynard had not obtained stable employment, that he had not been honest about having been fired from his last job, and that he had not produced proof of

employment for previous jobs that he claimed to have had. On June 1, 2015, Maynard produced proof of employment at Sollis Grain Bins that showed he had worked there since April 17, 2015. The circuit court found that Maynard had also failed to stay in contact with the Department.

The circuit court reduced child support to $80 a week, and the Department was ordered to bring pictures of the family's home to the next hearing. A termination hearing was set for August 26, 2015.

The Department filed a petition to terminate parental rights on July 2, 2015. In its petition, the Department asserted that termination was in the best interest of the children, specifically asserting that the children were adoptable and that there was the potential for harm if they were returned to their parents. In addition to the best-interest assertion, the Department contended there were three statutory grounds in support of termination: (1) that the children had been adjudicated dependent–neglected and out of the custody of both parents for twelve months and that despite meaningful effort by the Department to rehabilitate the parents and correct the conditions that led to removal, the conditions had not been remedied by either parent; (2) that other factors or issues had arisen subsequent to the filing of the original petition for dependency neglect that demonstrate that placement of the juvenile in the custody of the parents would be contrary to the health, safety, or welfare of the juveniles and that despite the offer of services, the parents had manifested the incapacity or indifference to remedy the subsequent issues or rehabilitate the circumstances at issue; and (3) that there were aggravated circumstances such that there was little likelihood of successful reunification.

SLIP OPINION

The termination hearing took place August 26, 2015. Department social worker Brittney Howard testified that on July 17, 2014, she received the case from Greene County and that she also received a hotline report that J.M. was outside by herself for the second time in two days while her mother was indoors sleeping. The environmental neglect was discovered when police investigated, and the children were removed from the home that day. She testified that the smell inside the house was so bad that she and the police officer had to immediately go back outside. Trash was piled everywhere, food and cigarette butts littered the floor, and the utilities were shut off. Howard observed during removal that L.M. seemed "limited in what she was able to do at her age."

Melinda Graves, a caseworker with Clay County Department of Human Services, was also there the day the children were removed from the home, and she testified to the same environmental neglect. Graves testified that when she visited the home where Dowden was living on January 5, 2015, there were dirty adult diapers all over the floor, cigarette butts everywhere, and that cans and trash were scattered around. The odor in the home had not improved. Graves testified that Dowden had stated that she was about to begin cleaning and that Maynard helped her clean when he got home from work. Human waste was all over the shower chair and bathtub. There was no furniture in any of the rooms except in the living room, which contained a bare mattress so dirty that it was black. A bag of trash and dirty adult diapers had been sitting next to an electric heater in the kitchen, which Graves unplugged. An open-flamed heater in the living room also had trash bags and adult diapers piled near it.

Graves testified that she visited again on January 30, 2015, and the conditions were the

same. During the visit, Dowden explained that they were going to move soon. Dowden also informed Graves that when the children returned home, the older child would take care of the younger child. Graves, after several failed attempts, performed another home visit on February 27, 2015, and she testified that she found the conditions to be the same as before.

Graves testified that their paths crossed a few more times, but Dowden and Maynard had been busy with doctor appointments and shopping for items for their new home, so home inspections could not be performed at those times. On May 27, 2015, Graves visited the new home. She noted that the porch was falling in and was unsafe and that it was still covered with the trash and the trash bags of dirty adult diapers that had been there on the previous attempted visits. Graves observed that the children's rooms contained beds and garment racks with clothes hung on them, and Dowden explained to Graves that her family had helped her buy things for the kids. Graves testified that the recliner chair and the house had a strong odor of human waste and cigarettes.

Graves visited the home again on June 23, 2015, and she testified that she had found Dowden cleaning when she arrived. Graves noticed the smell of mold, but Dowden explained that the house was just old. Graves testified that in June 2015, there was no sign that Maynard was living in the home but that during a July visit there was some very dirty bedding on the couch in the living room indicating that he was living there. The front porch had been torn apart for repair but had not yet been fixed. The trash had been removed from inside the home; however, the yard was still littered with nails, and two hot–water heaters were lying around. The electrical outlets did not have covers, which had concerned Graves. She

explained that the house was definitely better, but that "it seems as if they pick up items to a point, then it goes back to what it was."On cross-examination, Graves testified that cleaning supplies and help with the cleaning had been offered to the parents but that they had refused several times, saying they did not need help.

On the day of the termination hearing, Dowden brought Graves a letter showing that she would receive $548 a month for SSI. Maynard had not brought current proof of income with him. Graves stated that Maynard had given her proof of income before, but he had been fired from that job, and he was dishonest about what had led to his termination. Graves pointed out that Maynard could have completed the ordered psychological counseling while he was unemployed, but he had not done so until much later. Graves testified that throughout the case, she had set up appointments, and her assistant had tried to make contact with Dowden and Maynard, but neither parent had worked toward complying with the case plan during the first full year after removal.

Graves testified that the psychological exam on Maynard showed that he had a history of anger and depression and that it had been determined that he needed psychotherapy. Graves explained that Maynard had said that he would agree to counseling if it would help get the kids back but that he had stated that counseling was unnecessary and that it would be a hardship to try and schedule it.

Graves testified that Dowden still seemed to have problems adequately supervising her children and that during the most recent visit Dowden had gotten up from the table and walked away from the children, leaving them alone. Shortly after Dowden had left the area,

the four-year-old child also got up from the table and left the one-year-old child by herself. Graves testified that, in addition to this sort of behavior during visitation, Dowden routinely packed up to leave visits after an hour because she was too tired to complete the full two-hour visitation.

Graves testified that when the children had entered the Department's care, L.M., who had been one year old at the time, could not sit up, and J.M., who was then four years old, had not been toilet trained. All of J.M.'s teeth had rotted and fallen out, and the condition caused her to have to spit. By contrast, Graves testified that both children had been doing extremely well in foster care and that J.M. was recovering from severe failure to thrive and had begun kindergarten. Both children had received therapy and had stabilized within the last year, and there was a family interested in adopting them.

Graves testified that even if the parents had cleaned up the home sooner, she did not think the situation would change because she did not believe the parents had learned anything.

Dowden testified at the hearing. She denied being exhausted by visits and testified that she played with the children during visits and that she thought visitations were going well. Dowden testified that she had cursed at one of the caseworkers because the caseworker had lied about Maynard not living in the home with her. Dowden explained that Maynard's clothes were in a closet where the caseworker could have seen them, and the caseworker had been trying to "blackball" them. Dowden testified about all the structural repairs they had made to the home: patching, redoing floors, fixing water damage, painting, and installing a

laundry room on the back porch. She also testified that she had been cleaning the bathroom with Pine Sol every other day. The girls' rooms had been furnished, and she explained that Maynard's bedding was dirty because he had oily hair.

Dowden also testified that they had installed safety gates in their home, that they had removed all the trash and debris from their yard, and that she had begun smoking exclusively outdoors. Dowden presented pictures of the progress they had made within the last two weeks.

Dowden denied that the Department had offered help with the cleaning, and she testified that there had never been any indication that a caseworker had been by the house while they were gone. Dowden stated that she had started counseling and had finished parenting classes on July 21, 2015. Dowden explained that the delay in seeking counseling was because they had been under the impression that they had to go all the way to Jonesboro for counseling, and they did not realize they could get counseling in Corning.

Dowden stated that she had worked from "sun up to sun down" over the last couple of weeks to get everything ready for the girls to come home. She explained that the adult–diaper issue had been resolved and that she had been very weak and unable to clean properly when she had gotten out of the nursing home. Dowden explained that the person from whom she rented the house had left things in the home, and the city had not brought them a trash bin. Because animals might have gotten into the trash if she put it outside, they had let it pile up indoors. She disagreed that she and Maynard had argued in front of the children, and that if anyone said that, it was untrue. Dowden stated she did not like the caseworker and

admitted having cursed at her more than once.

Dowden recounted the April 9, 2015 visit at McDonald's. She testified that her eldest child had not been paying attention to her, and it had hurt her feelings. Dowden testified that she realized that she had not behaved properly, but she explained that the child had "pushed her buttons" and that the visit was "ending anyway." Dowden also contended that it was her opinion that J.M.'s hyperactivity had contributed to the child's failure-to-thrive diagnosis.

Maynard testified as well. He testified that he also thought visitations with the children had gone well. Maynard testified that he did not tell the psychologist that he and Dowden argued but that they had frustrations over money; now that Dowden was getting SSI, they had enough money. Maynard also testified that he was under the impression that counseling could only be done in Jonesboro, and he had not understood that the Department would help with transportation. He testified that he had been working twelve- and fourteen-hour shifts and that fitting counseling and cleaning into his schedule had been difficult.

The circuit court stated from the bench that it thought the parents had minimized the issues and that they did not realize or admit that the conditions of the home had been serious. The circuit court noted that the improvements in the environmental neglect had occurred in the last few weeks, that Dowden had not completed parenting classes until July, and that neither parent had followed through with the psychological-evaluation recommendations. The circuit court stated both children were adoptable and that there was potential harm in returning them to their parents.

In the termination order, the circuit court found all three statutory grounds for

termination that were alleged in the petition for termination.

The circuit court also noted in the order that the parents did not seem to fully understand that the conditions had been dangerous, that they had minimized the problems, that they had refused help with cleaning the house and that the progress made was mostly "on the eve of termination." The court commended Graves on her diligence in bringing parenting classes to Dowden while she had been in the nursing home, and the circuit court noted that Dowden had not pursued parenting classes on her own until late July, right before termination. The circuit court found that, because Dowden sought the parenting classes so late in the case, she had been unable to demonstrate the skills she may have learned. The circuit court noted that the parents were mobile and able to leave the home when they wanted to, yet they did not use their mobility or their time to work on the case plan until very recently.

The circuit court found that the parents had submitted to the psychological evaluations in a timely manner; however, their compliance with the recommendations had not occurred until after the permanency-planning hearing. The circuit court found that Maynard went in for "assessment" pursuant to the psychological evaluation on July 23, 2015, and that Dowden "did not follow through with the recommendations until July 31, 2015." The court found that neither parent had maintained contact with the Department and that Maynard had not provided proof of income regularly.

The circuit court found that Graves was a credible witness and that potential harm could result to the children if they were returned to their parents based on parental instability,

SLIP OPINION

their inability to care for the children, and because of the long history of environmental neglect. The court also found that J.M. and L.M. were likely to be adopted. The parents filed a timely notice of appeal.

## II. *Point on Appeal*

For their only point on appeal, Dowden and Maynard argue that the circuit court erred in granting the petition to terminate their parental rights because, even though their compliance was late in the case, they had substantially complied with the case plan and court orders, and the circuit court did not properly consider their efforts.[1]

## III. *Standard of Review and Applicable Law*

The standard of review is de novo, but the appellate court will not reverse unless the circuit court's findings are clearly erroneous. *See Judkins v. Duvall*, 97 Ark. App. 260, 248 S.W.3d 492 (2007). The appellate court, giving due regard to the circuit court's opportunity to judge the credibility of the witnesses, will not reverse the circuit court's ruling in a dependency–neglect case unless the ruling was clearly erroneous. *Anderson v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 522, at 4–5, 385 S.W.3d 367, 369–70. A finding is clearly

---

[1]Termination of parental rights is a two-step process. *Krantz v. Ark. Dep't of Human Servs.*, 2011 Ark. 185, at 4, 380 S.W.3d 927, 929. The first step is proof of a statutory ground. Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2009). The second step requires consideration of the likelihood that the juveniles will be adopted and the potential harm caused by returning the custody of the children to Dowden and Maynard. *See* Ark. Code Ann. § 9-27-341(b)(3)(A). The parents' failure to challenge these grounds abandons any challenge on appeal. *Anderson v. Ark. Dep't of Human Servs.*, 96 Ark. App. 395, 409, 242 S.W.3d 305, 316–17. Because Maynard and Dowden do not challenge the statutory grounds or best-interest findings in support of the termination order, we need not address those issues.

SLIP OPINION

erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* We give a high degree of deference to the circuit court, as it is in a far superior position to observe the parties before it and to judge the credibility of the witnesses. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

A parent's overtures toward participating in the case plan or obeying court orders following the permanency-planning hearing will not preclude termination. The court shall rely on the record of the parent's compliance in the entire dependency-neglect case and evidence presented at the termination hearing in making its decision whether it is in the juvenile's best interest to terminate parental rights. *See* Ark. Code Ann. § 9-27-341(a)(4)(A)–(B). Moreover, partial compliance with the case plan does not preclude termination. *Davis v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 815, at 11, 370 S.W.3d 283, 288. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, at 3, 434 S.W.3d 378, 381.

A child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Dozier v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 17, at 9, 372 S.W.3d 849, 854. A parent's past behavior is often a good indicator of future behavior. *Stephens v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 249, at 8, 427 S.W.3d 160, 164.



IV. *Analysis and Conclusion*

Dowden and Maynard argue that they made significant improvements towards compliance with the case plan during the three months prior to the termination, and the circuit court erred by not taking their late compliance into consideration. We disagree.

Arkansas Code Annotated section 9–27–341(a)(4)(A) expressly provides that a parent's overtures toward complying with the case plan and circuit court orders that occur only after the permanency-planning hearing are insufficient to defeat the termination of parental rights. In the present case, it is clear that the parents' efforts to rectify the environmental conditions that led to the removal of their children from Dowden's custody occurred after the June 3, 2015 hearing. The parents also failed to comply with the circuit court's order concerning parenting classes by not completing them until July 21, 2015, about six weeks after the permanency-planning hearing and order. The court specifically found that neither parent complied with the recommendations stemming from the psychological evaluation in a timely fashion.

Furthermore, the circuit court did, in fact, specifically consider the entire history of the case, including the events after the permanency-planning hearing on June 3, 2015, and after the petition for termination had been filed on July 2, 2015. In the permanency-planning order, the circuit court asked the Department to bring photographs of the conditions of the home, which were presented at the termination hearing. The circuit court noted that Dowden had recently completed parenting classes, but that both parents had failed to comply with the recommendations from the psychological evaluations. The circuit court expressed

the concern that Dowden and Maynard had seemed to minimize their issues, specifically, they had not grasped the severity of the environmental neglect.

The circuit court did not weigh the evidence in favor of Dowden and Maynard; however, the circuit court weighing the evidence differently than Dowden and Maynard wanted it weighed is not reversible error. *See Cox v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 202, at 11, 462 S.W.3d 670, 677. To reverse on this basis would require this court to act as a super fact-finder or second guess the circuit court's credibility determination, which is not our function. *Id.*; *Lynch v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 149.

Arkansas law supports the circuit court's consideration of the evidence and testimony concerning Dowden and Maynard's history throughout the entire case in its determination that termination was appropriate. We find no error, and we affirm.

Affirmed.

HARRISON and KINARD, JJ., agree.

*Terry Goodwin Jones*, for appellants.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.