SLIP OPINION



Cite as 2016 Ark. App. 430

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV–16–369

| | |
|---|---|
| JAMES MURPHEY and BRITANI MURPHEY<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES and MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered** September 21, 2016<br><br>APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. JV-14-128]<br><br>HONORABLE EDWIN KEATON, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellants James and Britani Murphey had their parental rights to their children, J.M., G.M., C.M.1, and C.M.2, terminated by an order of the Union County Circuit Court. On appeal, both appellants argue—in separate briefs—that the trial court's order terminating their parental rights was not supported by clear and convincing evidence. We find no error and affirm.

This family's history with the Arkansas Department of Human Services (DHS) dates back to 2012. On February 8, 2012, J.M. was removed from appellants for nearly a month due to the home being environmentally unsafe. Services were offered to the family and the case was closed on June 21, 2012. On March 22, 2013, J.M. and G.M. were removed from appellants for approximately two weeks because the house had dog feces all over it and it was

unclean and unsafe. Services were again offered to the family, and the case was closed on January 6, 2014.

A third investigation began in May 2014 for allegations of environmentally unsafe conditions of the home. A petition was filed on June 19, 2014, alleging that all four children were dependent–neglected. When the investigator went to the home she discovered that a dog was in the home,[1] there was little food, trash was all over the floors, there was at least one broken window, the home did not have gas, and the formula for C.M.1 and C.M.2 had not been picked up at the DHS office.[2] However, the children remained in appellants' custody at that time. Before a court date had been scheduled on the dependency-neglect petition, C.M.1 had to be airlifted to Arkansas Children's Hospital (ACH) on July 15, 2014, and was diagnosed with pneumonia and possibly sepsis. Britani went to the hospital to be with C.M.1; James and his girlfriend, Denise Barbine, moved into the home to take care of the other children. During this time, the condition of the home was improved in Britani's absence. DHS filed an amended petition for emergency custody and dependency-neglect on August 8, 2014. The court entered an ex parte order for emergency custody on August 8, 2014, finding that C.M.1 was dependent–neglected and placing him into the custody of James. In the adjudication order entered on November 10, 2014, the children were placed in the joint legal custody of appellants, with James having primary physical custody. The court ordered appellants to do a number of things, including to: follow the case plan; obtain and maintain

---

[1]This was in violation of a prior court order that no dogs be kept in the home.

[2]DHS picked up the formula for the children.

stable, clean, adequate, and suitable housing; keep all utilities on; and attend and participate in individual counseling. Britani was also ordered to complete parenting classes, undergo a psychological evaluation, complete budgeting assistance from DHS, and take all of her prescribed medications. The case's goal was reunification with Britani with a concurrent goal to remain in James's custody.

In the court report filed by Eugenia Ford on May 1, 2015, DHS made the following recommendation:

> Department is recommending the children remain in the home and custody of Mr. Murphey and for the [sic] Mr. Murphey to follow all court orders. Mr. Murphey needs to ensure the children are clean daily when they go to ECCEL. Mr. Murphey will ensure the children are seen by their PCP if the diaper rash continues to re-occur. Mr. Murphey will [get] rid of one dog and make sure the remaining dog is properly secured out of the reach of the children and any other person that makes visits to the home. Mr. Murphey will ensure the home is free of the large quantity of flies by putting screens on the windows.

The court entered a review and change of custody order on May 20, 2015.[3] In the order, the court found that James's home had deteriorated to the point that it was no longer safe for the children to remain there. The court noted that the home had "two broken windows, there is a wire hanging from the wall next to [G.M.'s] bed, [C.M.1] was having diaper rash so badly it was bleeding, there were bumps all over [C.M.2's] body and evidence of dogs being in the home despite the previous Court order." The children were placed in DHS custody. The order noted that Britani was incarcerated at that time.

---

[3]The court entered the same order on June 17, 2015.

In the court report filed on July 14, 2015, DHS recommended that the case's goal be changed to adoption "due to the chronic environmental issues in the home." DHS stated that this was the third removal of the children from either one or both of the parents. DHS filed a petition for the termination of appellants' parental rights on September 18, 2015. In the petition, DHS noted its previous history with the family, and alleged that appellants had subjected the children to aggravated circumstances, in that a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification.[4] The review order filed on September 23, 2015, set an October 2015 date for the termination of parental rights hearing. The hearing was continued at the request of James. It took place on November 16, 2015.

Quiana McGhee, an assessment unit investigator with DHS, testified that she investigated the family twice, and that as a result of the investigations, one or more children had to be removed from appellants' custody. She also stated that she conducted other investigations on the family which did not result in removal. She admitted that she had no involvement in the present case.

Teresa Johnson, a former investigator with DHS, testified that she filed the petition for dependency-neglect and the accompanying affidavit on the family after visiting the home on May 22, 2014. However, she stated that she was not involved with the removal of the children from appellants. On cross-examination, she stated that she filed an affidavit in another case in which it was alleged that James was the father of one of the children that had

---

[4] *See* Ark. Code. Ann. § 9-27-341(b)(3)(B)(ix)(*a*)(Repl. 2015).

SLIP OPINION

to be removed due to environmental concerns on May 2, 2015. She said that the children were removed from a home that belonged to James, and that James was present at the time of the removal.

Carolyn Samuel, County Supervisor for Union County, testified that the children were not initially removed from appellants when this case was filed. She stated that due to the situation concerning C.M.1, DHS took a hold of him on July 31, 2014, after his release from ACH. Appellants were living in separate homes, and James was subsequently given custody of C.M.1. Samuel testified that the children were adoptable and that their foster parents had expressed an interest in adopting them.

On cross-examination, Samuel stated that she was not the main caseworker, but that Eugenia Ford was. She said that she was Ford's supervisor. She stated that James had continued to visit the children and that those visits were very interactive. She testified that James usually had several members of his family with him at the visits. According to Samuel, the children appeared to love James and to have a stable relationship with James's parents. However, she stated that she did not think that there was a chance of a possible nurturing relationship between James and the children in the future. She testified that aside from the environmental conditions, James had never physically harmed the children. She testified that James had recently moved into Britani's grandmother's home, which was "a better house than what they were living in, but James was asked to leave that same residence before from the grandmother."



Eugenia Ford testified that she was the caseworker assigned to the case since October 2014. She stated that different services had been offered to the family since May 2014. She testified that psychological evaluations were never performed due to DHS having a new contract. Those evaluations were scheduled for December. She stated that Britani was currently incarcerated and that there had not been any significant improvement in Britani's situation since the beginning of this case. She opined that the children would suffer potential harm if placed back in Britani's custody because of "lack of housing; her arrests, which she's currently in jail now; she's been arrested twice in June with threatening harm to her husband and significant other and possibly the children; she's been in acute placement and hospital twice; . . . her inability to manage her finances and not wanting assistance from the Department of helping her find housing." Ford stated that she visited James's residence the day before the hearing and that the home was "spotless." She said that James and Denise moved into the residence on October 18, about a month before the hearing. She stated that James had recently begun his court-ordered individual counseling, although it had been ordered for "as long as [she'd] been a part of this case." She said that initial issues arose because Melissa Butler performed a mental-health evaluation on James and stated that she did not have enough information to give him counseling sessions. She stated that she explained to James that he was court ordered to attend counseling and that he started going. She testified that when she visited the home James had the children living in on May 4, 2015, there were issues with the bathroom flooring, there were a "zillion" flies in the house, there were no screens on the window, the back door was half off the hinges, and there were

multiple dogs present. However, she said that when she returned to the home in August, the house was better in that the house was cleaner, there were fewer flies, screens were on the windows, and new doors were up.

Ford testified on cross-examination that James's counseling reports were becoming more favorable. She stated that James's attitude had changed from reluctance to liking to go and talk about what was going on in his life. She said, "In my opinion, as his caseworker, I believe the last couple of months that James is doing all he can do to work services. He's done." She stated that James was trying to repair the problems found in the home in good faith before he moved in October. She said that James's visitations with the children went very well. She testified that the chance of a positive relationship between James and the children depended on the court's order at the end of the hearing. She stated that she visited James's residence the night before the hearing and that she did not see anything threatening to the children at that time. She said that James had attempted to remedy the problems that were brought to his attention. When asked about possible relatives willing to take the children, Ford stated that "[James] mentioned an aunt but that lady is not at her residence. She's in California for a couple of weeks so that wouldn't be possible. [Britani's] mother has expressed interest." She stated that DHS would have to go through ICPC to see if there is a possible alternative to termination with possible permanent placement being a consideration.

Upon questioning by the attorney ad litem, Ford stated that when she wrote her report on May 4, 2015, she was not seeking to have the children removed from James's custody, even though there were flies all over the ceiling and walls. She stated that James was going

7

to purchase some fly strips and fix the windows, and that she thought this was an appropriate solution to the problems.[5] She said that ECCEL did not inform her that the children had to be bathed daily, but that they did tell her that the children were being bathed often. She opined that she was unsure if placing the children back with James would give them permanency, considering the history of the case. Ford stated that there had not been any issues with the children since they were placed in foster care. She said that C.M.1 went from being failure to thrive to thriving, walking, and doing everything.

Britani testified that she was currently incarcerated at the Union County Jail for failure to comply. She stated that she was incarcerated earlier in the year for terroristic threatening. She said that she and James had lived in multiple residences, and that she had also lived in residences without James. She admitted that she did not have a place to live. She said that she had previously asked Sharon Foster to help her find a place to live and that she asked Carolyn Samuel the same thing right before the hearing. She testified that she was not seeking custody of her children, but that she wanted to get a house where they could come visit her. She conceded that she was not in a position to take custody of the children. She stated that she was presently trying to get her "mental illness together." She said that she did not know where she would stay once she was released from jail. She testified that she had been trying to get her life back together by going to the hospital when her medicines were not right and by going to counseling on a regular basis. She stated that she had not had her court–ordered psychological evaluation because an appointment was never made for her.

---

[5]She stated that the report noted that James had previously fixed the back door.

Upon examination by the attorney ad litem, Britani stated that she and James were still married and that she continued a relationship with him even though he was in a relationship with Denise. She testified that she asked her grandmother to allow James to rent the house he was currently living in. She said that James and her grandmother did not get along well once, but that their relationship was a little better. She stated that she lived with James's brother, Michael, before she went to jail. She admitted that Michael was a sex offender. She said that she understood that DHS did not want her children around Michael, but that she needed a place to stay. She testified that the house was condemned just shortly before she went to jail.

On cross-examination, Britani testified that she had been diagnosed with post-traumatic-stress syndrome, borderline personality disorder, and manic bipolar. She stated that she used to be a cutter until she met James. She said that she did not think going to Hope House was a good idea because she did not want to grant the person that runs Hope House power of attorney over her SSI check. She admitted that she could have tried to get her grandmother's house for herself, instead of for James.

James testified that he understood that DHS was asking the court to terminate his parental rights mainly because of environmental neglect. He stated that he had taken steps to rectify the situation and improve his living situation by going to counseling, getting rid of a lot of stuff that was cluttering the house, and getting rid of his dogs. He said that he did not start attending counseling until August although he was court-ordered to go "quite some time ago" because he did not want to talk to anyone. However, he stated that when he started

going, he began to open up a lot more. He stated that the sessions had been going well and that he can talk to people more since he learned to open up. He said that counseling had helped him realize what he needed to do to regain custody of his children. He stated that he understood that this was the fourth time the children had been removed, but he asked the court for another chance. James testified that he had only missed one visit with the children. He stated that he would bring his family and Denise to the visits, and that his parents have a healthy, stable relationship with the children. He said that he felt that he was capable of having a positive and nurturing relationship with his children. He stated that he was ready to have the children returned to him and that he did not know of anything at his current residence that would pose a threat to them. James said that he was financially able to support the children. He stated that Denise was a positive influence and that she was going to be a part of his future. He testified that his parents and sister were his support system and that they would help him with the children.

On cross-examination, James stated that he left his previous residence because he heard rumors that Britani was going to get the home condemned. He said that he believed the rumors because Britani had gotten two of his father's houses condemned. He testified that he received SSI and that he also worked with a friend "underneath the table." He denied having any dogs but stated that his sister would bring her dog over when she came to visit him. James stated that he was with Denise when the children were removed from his custody. He also said that he was with her in 2014 when DHS initiated this case.

Denise testified that she lived with James and that their current residence was in good condition. She stated that the house was clean and that all the utilities were on. She said that she got along well with the children and that she attended almost all of the visits with James. She testified that she considered herself to be a positive influence on James and that she has helped him with housekeeping as well as with his children. She stated that there were no dogs, no problem with flies or other bugs, and no broken windows or doors at the house. She opined that the children would be "perfectly safe" at the house if they were returned to James. She testified that she would help James with the children if his rights were not terminated. Denise stated that she was currently unemployed, but that James was working. She stated that she and the children were bonded and that there was a support system in place if the children were returned.

On cross-examination, Denise stated that she met James online and that they had been living together since June 2014. She admitted that she was living with James when the children were removed from his custody on May 4, 2015.

Cathy Noon, James's mother, testified that before the children were removed, she saw them everyday. She also stated that she would let them spend the night with her every Saturday night so that she could take them to church on Sunday. She said that she and the children were bonded and that they called her GiGi. She testified that she did not believe that James's parental rights should be terminated because he had done everything DHS asked of him. She stated that if the children were returned to James, she would see them almost daily and keep them on the weekends so that they could attend church with her. Cathy testified

that she had a nurturing relationship with the children. She opined that James's current residence was clean and suitable for the children.

On cross-examination, Cathy stated that she once asked to be considered as a relative placement for the children when they were removed the second time. She said that this was the third time the children had been removed from James. She testified that she visited the children every week before they were taken. She stated that she had a problem with the condition of that house, but that the new house is the "total opposite" of the last one. Cathy testified that she also visited the house that Britani and James shared. She stated that Britani was an average mom and that the children were "sometimes" taken care of.

The court found by clear and convincing evidence that DHS had proven the ground for termination. It also found that the children were adoptable and that the termination was in the children's best interest. Accordingly, the court granted DHS's motion to terminate appellants' parental rights. Appellants filed timely notices of appeal.

Termination-of-parental rights cases are reviewed de novo.[6] To terminate parental rights, at least one statutory ground must exist, as well as a finding that it is in the child's best interest for parental rights to be terminated; these must be proved by clear and convincing evidence.[7] In making a "best interest" determination, the circuit court is required to consider two factors: (1) the likelihood the child will be adopted, and (2) the potential harm to the

---

[6] *Schaible v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 541, 444 S.W.3d 366.

[7] *Id.*

child if custody is returned to a parent.[8] Clear and convincing evidence is that degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established; the appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[9] In resolving the clearly erroneous question, we must give due regard to the opportunity of the circuit court to judge the credibility of witnesses.[10]

Potential harm must be viewed in a forward-looking manner and considered in broad terms.[11] The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm.[12] Each factor need not be proven by clear and convincing evidence, rather it is the overall evidence that must demonstrate clearly and convincingly that termination is in the children's best interest.[13]

The intent behind the termination–of–parental–rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be

---

[8]*Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, 434 S.W.3d 378.

[9]*Id.*

[10]*McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005).

[11]*Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722.

[12]*Welch v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290.

[13]*McFarland, supra.*

accomplished in a reasonable period of time as viewed from the child's perspective.[14]  Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.[15]  Finally, a parent's past behavior is often a good indicator of future behavior.[16]

James argues that the evidence was insufficient to support the aggravated circumstances ground for termination.  This argument is without merit.  The evidence reveals that the children were removed from James's custody at least three times.  Each time, the removal was due to environmental issues.  The children were returned on two occasions and the cases were closed; however, the children were subsequently removed again.  James focuses on the efforts he has made to comply with the case plan, but, even full compliance would not determine whether or not his children were returned to him.[17]  Here, the court noted that James had only recently started attending his court-ordered counseling, and that it was only in the "past few weeks that James Murphey, Jr. recognized the need to find a more suitable place to live."

Under these facts, we are unable to say that the court's finding that James subjected the children to aggravated circumstances was clearly erroneous.

James also contends that termination was not in the children's best interest because there was insufficient evidence to support a finding of potential harm.  A parent's past

---

[14]Ark. Code Ann. § 9-27-341(a)(3).

[15]*Ford, supra.*

[16]*Stephens v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 249, 427 S.W.3d 160.

[17]*Ford, supra.*

behavior is often a good indicator of future behavior.[18]   Here, despite successfully having a

child or children returned in two previous cases, the children were removed from James's

custody for the same or similar reason in May 2014.[19]   Given the previous history of this

family with DHS, we cannot say that the court's finding that the children would be subjected

to potential harm if they were returned to James was clearly erroneous.   Accordingly, we

affirm.

Britani argues that the evidence did not support the aggravated circumstances ground

for terminating her parental rights.  The evidence at the hearing revealed that the children had

been removed from Britani's custody on three separate occasions for environmental issues.

At the time of the termination hearing, she conceded that she was in jail, and was not in a

position to have the children returned to her custody.  She also stated that she had no home

to return to when she is released from jail.  As part of her challenge, Britani contends that

DHS failed to provide her with necessary services (psychological evaluation), failed to provide

reasonable accommodations pursuant to ADA,[20] and failed to "fully" attempt to place the

children with family.  These arguments are either raised for the first time on appeal or were

not addressed or ruled on by the trial court.  Failure to raise challenges or to obtain a ruling

---

[18]*Stephens, supra.*

[19]The children were removed from James's custody a total of three times in less than four years for environmental issues.

[20]She also make several arguments contending that James's parental rights should not have been terminated based on aggravated circumstances.  However, she does not have standing to contest the termination of James's parental rights.  *See New v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 604.

below is fatal to the appellate court's consideration on appeal.[21]   Therefore, they are not preserved for our review.  The court's finding that Britani had subjected her children to aggravated circumstances is not clearly erroneous, and we affirm this finding.

Britani also contends that the evidence did not support a finding of potential harm to the children.  She admits that she was not in a position to have the children safely returned to her.  However, she argues that there was no potential harm if the children were returned to James's custody.  Britani lacks standing to argue James's position on this issue.[22]  Thus,  we affirm.

Affirmed.

VAUGHT and HIXSON, JJ., agree.

*Dusti Standridge*, for appellant Britani Murphey.

*Tina Bowers Lee*, Ark. Pub. Defender Comm'n, for appellant James Murphey.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by:  *Keith L. Chrestman*, attorney ad litem for minor children.

---

[21]*See Burkhalter v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 520.

[22]*New, supra.*