

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–15–279

| | |
|---|---|
| MICHELLE OLDHAM<br><br>APPELLANT<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES<br><br>APPELLEE | **Opinion Delivered** September 16, 2015<br><br>APPEAL FROM THE PULASKI<br>COUNTY CIRCUIT COURT,<br>ELEVENTH DIVISION<br>[NO. 60JV–2013–2056]<br><br>HONORABLE PATRICIA JAMES,<br>JUDGE<br><br><br>AFFIRMED |

## CLIFF HOOFMAN, Judge

Appellant Michelle Oldham appeals from the order of the Pulaski County Circuit Court terminating her parental rights to her two children, J.W. and J.O. On appeal, Oldham challenges the sufficiency of the evidence to support the termination. We affirm.

The facts giving rise to this case began on December 17, 2013, when fifteen-day-old J.O. was brought to the hospital with a skull fracture. When Oldham was informed that J.O. needed to be admitted, she began acting manic, shouting at the staff, and threatening to take her child home. Law enforcement was called, and Oldham was then arrested on an outstanding warrant for failure to pay a fine. The Arkansas Department of Human Services (DHS) was notified and filed a petition for emergency custody of J.W. and J.O., due to the lack of a legal caretaker for the children and concerns about Oldham's mental status. According to the affidavit attached to the petition, Oldham explained that her unpaid fine was

from when she was on probation for a domestic-violence conviction and that J.O. had received the skull fracture after one-year-old J.W. pulled J.O. off the bed. Oldham denied that she had a mental illness or that she was currently on any medication.

An order for emergency custody was entered by the circuit court on December 20, 2013, and a probable-cause order was entered on December 30, 2013. The circuit court ordered Oldham to obtain a psychological evaluation, a drug-and-alcohol assessment, a counseling assessment, and a medication-management assessment. The court further ordered random drug screens and twice-weekly supervised visitation, and Oldham was also required to complete parenting classes and to maintain stable housing, employment, and income.

The adjudication hearing was held on February 24, 2014, and the circuit court found that the children were dependent-neglected based on the allegations of parental unfitness contained in the emergency petition for custody. The court found that Oldham had not attended her scheduled drug-and-alcohol assessment and that she had failed to attend the first portion of her psychological evaluation because she claimed that it was too cold outside to ride the bus. Oldham was told not to come for the second scheduled portion of her evaluation because she had not yet completed the first part; however, Oldham showed up anyway and was then asked to leave after she threatened the staff. Her evaluation was reset for March 3. The court noted at the adjudication that Oldham was now homeless and staying in various motels. Oldham continued to deny that she had been diagnosed with a mental illness. The circuit court found that, although there had been a true finding for inadequate supervision against Oldham due to the circumstances surrounding J.O.'s skull fracture, the

"bigger problem" was Oldham's untreated mental disease, which placed the children at risk. In addition, the court found that Oldham had no stable housing. The goal of the case was set as reunification with Oldham, and prior orders remained in place, with the court emphasizing that Oldham was to undergo the psychological evaluation as scheduled, to follow through with her individual therapy, and to become stable so that she did not have to rely on others for assistance.

Oldham failed to attend her next scheduled psychological evaluation and was eventually seen by Dr. Paul Deyoub on April 8, 2014. A report from the evaluation was introduced at the May 2014 review hearing. Dr. Deyoub diagnosed Oldham with "Bipolar Disorder, Manic, Severe" and "Child Neglect, Possibly Abuse." He stated that Oldham had a long history of mental illness and "absolutely no insight" into her condition. He further stated that there was no way the children could be returned to Oldham's custody unless she had a significant period of remission. Dr. Deyoub stated that Oldham needed to see a psychiatrist, be compliant with her medication, obtain stable housing and sufficient income to support the children, and attend anger-management and parenting classes. While he did recommend therapeutic services, Dr. Deyoub indicated that Oldham's mental illness was so chronic that he did not see how the children could be safely returned.

Based on the evidence presented at the review hearing, the circuit court found that Oldham had not been compliant with the case plan. Oldham was living with a friend and had not obtained a stable home; she was unemployed and typically spent all of her disability income by the second week of each month; she had been released from therapy for lack of

attendance; she had failed to attend an appointment for a medication assessment; visitations with the children had not gone well due to Oldham's behavior and were being reduced to once per week; and she continued to deny having bipolar disorder and refused to take medication for it. The court found that Oldham's lack of insight demonstrated no desire on her part to get better. With regard to Oldham's homelessness, the court noted that the places she stayed were not even safe for her, much less her children. The court authorized the attorney ad litem to file a termination petition, although DHS was ordered to continue providing services to Oldham.

A joint petition to terminate Oldham's parental rights was filed by DHS and the attorney ad litem on September 30, 2014, alleging the "other factors" ground for termination contained in Ark. Code Ann. § 9-27-341(b)(3)(B)(vii) (Supp. 2013). The petition also alleged that termination was in the children's best interest.

The joint permanency planning/termination hearing was held on November 19, 2014. At the hearing, Dr. Deyoub testified about Oldham's history of mental illness. Based on her lack of insight and refusal to take medication, Oldham had not responded positively to treatment in the past, and Dr. Deyoub indicated that she had a very poor prognosis going forward. He explained that Oldham's diagnostic tests demonstrated significant schizophrenic and paranoia elevations, leading to many of the same problems with thinking and reasoning ability that schizophrenics experience. According to Dr. Deyoub, Oldham also scored in the significant range on the Child Abuse Potential Inventory (CAP) test. Dr. Deyoub opined that J.W. and J.O. would not be safe in Oldham's care unless there was evidence that she was

complying with treatment and free of symptoms for a significant period of time.

Samantha Parsons, the DHS caseworker assigned to the family, testified that the services offered to Oldham included parenting classes, random drug screening, a psychological evaluation, individual therapy, anger management, bus passes, visitation, and case management. Parsons indicated that Oldham was in partial compliance with the case plan, as she had participated in all of these services but had not obtained stable housing or employment as ordered by the circuit court. In addition, Parsons testified that, even though Oldham had undergone parenting classes and anger-management therapy, she still had issues with anger and with making appropriate parenting decisions, which Parsons had witnessed during visitation. Parsons stated that she had attempted to assist Oldham with budgeting issues; however, Oldham was still unable to support herself with her $721 in monthly disability income, all of which was usually spent in the first few days of each month. Parsons testified that DHS was recommending termination of Oldham's parental rights due to her mental issues, unstable housing, and unemployment. Parsons further stated that it was in the children's best interest that they be adopted due to the potential harm from Oldham's mental illness, which she still refused to acknowledge, and Oldham's unstable relationship with the children's father.

Wendy Childs, an adoption specialist with DHS, testified that the children were adoptable. She indicated that she had identified thirty-five families that matched the children's criteria, including their ages and family history.

Oldham testified that she had done her best to comply with the case plan in order to

have her children returned, although she believed that she had done nothing wrong. She denied that she suffered from bipolar disorder or that she had a problem with anger. Although she admitted that her sources of income were limited, she claimed that she could support her children if they were returned to her custody because she could get assistance from family and church members. Oldham testified that she did not currently have a residence of her own but indicated that they could stay at the home of the children's aunt and uncle. She admitted, however, that she had gotten into an argument with the children's father and aunt the night before the hearing and had been asked to leave. Oldham testified that at the time the children were removed in December 2013, she had a home and was receiving assistance with her rent from a charitable organization. However, she was asked to vacate that residence in January 2014 and had been staying at motels or with friends since that time.

After hearing all the evidence, the circuit court entered an order on January 13, 2015, finding that the ground for termination alleged with respect to Oldham was proved by clear and convincing evidence. The court also found that there was clear and convincing evidence that termination of Oldham's parental rights was in the best interest of the children based on the likelihood that they would be adopted and the potential harm to their health and safety if they were to be returned to their mother. Oldham has timely appealed from this order.[1]

The rights of natural parents are not to be passed over lightly; however, parental rights

---

[1] The parental rights of the children's father, Jerry Webb, were also terminated in the same order; however, he is not a party to this appeal.

will not be enforced to the detriment or destruction of the health and well-being of the child. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). A trial court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2013); *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is defined as that degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established. *Dinkins*, *supra*. On appeal, the appellate court will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

Pursuant to Ark. Code Ann. § 9-27-341(b)(3), an order terminating parental rights shall be based upon a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood of adoption and the potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent. The order terminating parental rights also must be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B).

The ground for termination relied upon by the circuit court in this case was the "other factors" ground contained in Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*) (Supp. 2013), which



states as follows:

> Subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrate that return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances, which prevent return of the juvenile to the family home.

As support for its decision to terminate on this ground, the circuit court relied on Oldham's diagnosis of bipolar disorder from Dr. Deyoub, Oldham's lack of insight into her disorder, her refusal to acknowledge her mental illness despite participation in counseling, and her instability throughout the case with regard to her housing and income. The court noted that Oldham's mental illness was apparent in her testimony at the hearing, which was contradictory and disjointed. Based on Oldham's instability, denial, and lack of insight, the court found that she was "incapable of remedying these and other subsequent issues so that the children could safely be placed with her" and that she was "not capable of being the type of parent these children need."

Oldham argues that there was insufficient evidence to support the circuit court's decision to terminate on this ground because her mental illness was not a factor that occurred subsequent to her children's removal. She contends that her mental health was detailed in the petition for emergency custody, as well as in her mental health records prior to removal. While there were concerns about Oldham's mental stability at the time of the children's removal and at the time the petition for emergency custody was filed based on her erratic and volatile behavior at the hospital, the primary reason for the seventy-two-hour hold on the children was the lack of a legal caretaker when Oldham was arrested. It was subsequent to

the petition for emergency custody that Oldham's past medical records were submitted to the court and that she was evaluated and diagnosed by Dr. Deyoub. Furthermore, Oldham's lack of insight regarding her mental illness, despite her participation in therapy, was discovered subsequent to the filing of the emergency petition and was an important factor that the circuit court relied on in determining that termination was warranted. In addition, Oldham became homeless after the children were removed, and she failed to remedy her unstable housing and income throughout the entirety of the case.

Oldham asserts that she should have been given a full twelve months to work toward reunification; however, the "other factors" ground does not require that the children remain out of the home for at least twelve months before termination can occur. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*). She also contends that this ground for termination requires DHS to have offered "appropriate family services" and that there was no evidence that reasonable accommodations or meaningful services were offered to her, despite her known mental disability. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*b*) (requiring that DHS make reasonable accommodations in accordance with the Americans with Disabilities Act to parents with disabilities in order to allow them meaningful access to reunification and family preservation services). This particular argument is not preserved for our review and need not be addressed because Oldham failed to raise this issue below; nor did she challenge the circuit court's findings throughout the case that appropriate services had been offered to her by DHS. *Weathers v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 142, 433 S.W.3d 271; *Gilmore v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 614, 379 S.W.3d 501. In addition, Oldham's

9

argument that the circuit court should not have relied solely on her psychological evaluation with Dr. Deyoub, but should have also required testimony about her treatment plan and prognosis from her current therapists, was not raised below and is not preserved for appellate review. *Weathers, supra.* Given the evidence regarding Oldham's instability, mental illness, and complete lack of insight about her illness, the circuit court did not clearly err by finding that the "other factors" ground for termination was proven.

Oldham also challenges the circuit court's finding that it was in her children's best interest for her parental rights to be terminated. She does not contest the circuit court's finding that the children were adoptable, and she further concedes that there would be potential harm to her children if they were subjected to her homelessness and to her untreated bipolar disorder. However, she argues that these issues were the result of her not being offered appropriate services. Oldham asserts that there would be no potential harm to her children by allowing her additional time for further mental health treatment and other services. With regard to her argument about not being offered meaningful services, we have already held that this argument is not preserved for our review. Furthermore, the circuit court specifically found that if Oldham were given additional time, it would not make any appreciable difference toward reunification given her lack of progress in managing her mental illness. The court also found that it was not in the children's best interest for them to "needlessly languish in foster care" for an additional period of time. Based on the evidence in this case, the circuit court's best–interest finding was not clearly erroneous, and we affirm the termination order.



Affirmed.

GLADWIN, C.J., and WHITEAKER, J., agree.

*Dusti Standridge*, for appellant.

*Mischa K. Martin*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by:  *Keith L. Chrestman*, attorney ad litem for minor children.