WAYMOND M. BROWN, Judge
Appellant appeals from the circuit court's order terminating his parental rights to D.J., born 3/3/16. On appeal, he argues that there was insufficient evidence to support termination of his parental *492 rights. He also argues that the Arkansas Department of Human Services (DHS) failed to offer sufficient proof of the other elements of both the subsequent-factors and aggravated-circumstances grounds rendering its grant of termination reversible. We affirm.
D.J. and his mother, Jonese Boyd,[1] tested positive for cocaine and THC at the time of D.J.'s birth. Appellant was contacted and verbally acknowledged paternity of D.J. Noting, among other things, a history with DHS that included a Garrett's Law case in 2011 and another in 2014, a 72-hour hold was taken on D.J. on March 4, 2016.[2] DHS filed a petition for ex parte emergency custody and dependency-neglect on March 7, 2016. The circuit court entered an order for emergency custody on the same date.
A probable-cause order was entered on March 14, 2016, finding that probable cause for D.J.'s removal existed and continued to exist by stipulation of the parties. Because a named father had yet to be added as a party to the matter, "any legal and biological father" was ordered to submit to random drug screens, complete a drug-and-alcohol assessment, complete a counseling assessment, complete a psychological assessment, and maintain stable housing and income. Appellant was ordered to establish paternity, and all visitation and services were ordered to begin for him once his paternity was established. Appellant was not present at the hearing, but a positive drug test for THC from appellant was submitted as an exhibit.
In its May 2, 2016 adjudication order, the circuit court adjudicated D.J. dependent-neglected based on Garrett's Law due to the positive drug tests on D.J. and Boyd, by stipulation of all the parties. The circuit court found that D.J. had no noncustodial parent because appellant was a putative father. The goal of the case was reunification with Boyd with a concurrent goal of adoption. The order noted that appellant lived with Boyd, the latter of whom needed support from a sober parent. It went on to state that "[i]f [appellant] wants to be involved in the life of this child, he needs to take the DNA test and stop doing drugs.... Choices will need to be made, all the way around."
In its August 22, 2016 review order, the circuit court noted testimony that appellant completed DNA testing on August 5, 2016; and that appellant was living with Boyd and handling her financial needs. Appellant was ordered to complete a hair-follicle drug test. The parties were advised that missed screens were considered positive by the circuit court. The goal of the case was reunification with the mother.
In its February 8, 2017 permanency-planning order, in which appellant first appeared as a party in the style of the case, the circuit court stated that appellant's drug-and-alcohol assessment recommended outpatient treatment. The order stated that appellant had denied drug use despite having positive hair-follicle tests. The order stated that appellant had an order of paternity. The circuit court instructed that "[i]f [appellant] wants to be clean and get his child, he may have to let *493 mother go." Specifically relating to appellant, it stated the following:
DON JOHNSON testified that he has four children.... Two of the children are grown. He lives with Jonese Boyd. He has lived with her six years. He has been to prison four times. It was for possession with intent to deliver cocaine. That was 1998 and other times. He was not in prison for theft of property in 2013. He went to prison in April 2013 for possession. He has had 3 drug charges he was found guilty or pleaded guilty to; he has been to prison for three drug charges. He is on parole. He was positive for marijuana up to August 1. He is trying to get his son back. He has not used cocaine. He has an order of paternity,[3] and he has to pay child support. It came two months ago. He wants to remain a family unit with mother. He works; he drives trucks. He plans to continue this job.
The circuit court found that appellant was "just now getting going on services. We are a year in." The goal of the case was changed to adoption.
DHS filed a petition for termination of appellant's parental rights on March 7, 2017. The grounds given in support of termination of his parental rights were:
1. That the juveniles had been adjudicated dependent-neglected and had continued out of the custody of the parent for twelve months and despite a meaningful effort by the department to rehabilitate the parent and correct the conditions which caused the removal, those conditions had not been remedied by the parent;[4]
2. That, subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrate that placement of the juveniles in the custody of the parent is contrary to the juvenile's health, safety or welfare and that despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances which prevent the placement of the juveniles in the custody of the parent;[5] and
3. That the parent is found by a Court of competent jurisdiction, including the Juvenile Division of Circuit Court to have subjected any juvenile to aggravated circumstances.[6]
Additionally, DHS asserted that termination of appellant's parental rights was in the best interest of the children.
Appellant submitted a response to DHS's petition on April 4, 2017, requesting that the circuit court dismiss the petition and grant him custody of D.J. He specifically denied the grounds asserted by DHS and that termination was in D.J.'s best interest as he denied that there were not any barriers to adoption for D.J., and denied that there was any potential harm in giving custody of D.J. to him.
DHS filed a motion to dismiss its own petition to terminate appellant's rights on May 3, 2017. It stated therein that appellant had been compliant since the February 8, 2017 permanency-planning hearing, noting that appellant had not had a positive *494 drug test since the last court date.[7] Attached as an exhibit thereto was appellant's graduation certificate from parenting classes.
The attorney ad litem filed a petition for termination of appellant's parental rights on May 8, 2017. It alleged the same three grounds-the twelve-months-without-remedy, other-subsequent-factors, and aggravated-circumstances grounds-that DHS alleged in its March 7, 2017 petition based on essentially the same arguments.
On the same date that the ad litem filed its termination-of-parental-rights petition, a hearing was held before the circuit court and the circuit court entered a fifteen-month permanency-planning order. Therein, it granted DHS's motion to withdraw its termination petition. The order stated that Tameka Jones, the family services worker, testified that both parents, who resided together in an appropriate and well-maintained home, had made significant, measurable progress since she obtained the case in August 2016, and that reunification could be achieved in a reasonable time. Jones testified that the parents were ready for unsupervised visits; her supervisor believed a trial placement could start in three months. Other pertinent testimony revealed that appellant gambled, but "not that much"; and the foster parent testified that D.J. is pretty "laid back most of the time" but he has "a little of a temper, but that is just getting bigger."
The circuit court found that both parents were complying, but the goal of the case was "reserved." Visitation was to remain as previously ordered and it found, as it had throughout the case, that DHS had made reasonable efforts to provide services and achieve the goal of the case. It specifically found:
Doing services is not the same thing as benefitting from services. There has not been random drug or alcohol screening. The Court has to rely on the hair drug screens due to this.
This case cannot go on forever. There is no doubt the parents love the child, but they have to actually show a benefit from services. Either the parents are in this, or they are not. They have to do more than check off boxes. They must provide sign in sheets, proof of attendance, and proof of actual work being done and improvements being made.
The Court has seen no information that this child is truly "special needs," and the Court is not going to slap that label on every child in DHS custody. The attributes that [the foster parent] described can very well be merely a demanding child, not based on some underlying disorder or issue.
[Appellant] has money to gamble, he has money to contribute to attorney fees.to the father would result in successful placement of the child with him. He has previously testified that he has lived with the Mother for six years. [D.J.] is the third child they have had together. All three have been Garrett's Law cases.
....
[Appellant] has testified at prior hearings that he intends to remain with Ms. Boyd and live together as a family. Even if he were to become substance-free, he cannot provide a safe and appropriate home for the child as long as the mother lives there. He has shown no inclination to separate himself from Mother, despite her ongoing drug usage. Further, Mr. Boyd [sic] has testified previously that he is on parole for prior drug-related convictions. At worst, his prior positive drug screens have jeopardized his liberty. At best, even if he is now drug-free, the mother's drug use puts him at risk of obtaining a parole violation, as well. The Court made it very clear to [appellant], indeed both of these parents, that mere lip service is insufficient for placement.
....
[Appellant] completed his psychological evaluation, after initially missing the first scheduled appointment. He completed parenting classes. He started outpatient drug and alcohol sessions but is not even halfway through with the assessment recommendations despite having those results for six (6) months. [Appellant] still lives with Ms. Boyd. He still denies using drugs for which he has tested positive. He plays games with availability for random drug screens. The Court sees no change in his circumstances from those that existed when the child came into care. The Court cannot ascertain any available service that can correct his mindset when [appellant] himself seems content to maintain it despite Court involvement for seventeen (17) months in this case. It is for these reasons that the Court finds that there *496 is little likelihood that continued services to the father would result in successful placement of the child with him, which is aggravated circumstances.
Characterizing appellant's efforts as "half-hearted[,]" the circuit court found those efforts insufficient to sustain a goal of reunification as "additional time would merely require the child to needlessly languish." Accordingly, it found no compelling reason to grant appellant additional time for services or attempts at compliance. Additionally, it found that appellant was not a fit and proper parent and stated that it had "no confidence" that he could consistently and safely provide for D.J. as appellant had shown no evidence that he could provide what D.J. needed: a "stable, safe, appropriate environment with a drug-free parent who will ensure he receives appropriate care and supervision." It found that termination was in D.J.'s best interest, making the necessary potential-harm and adoptability findings. This timely appeal followed.
The standard of review in appeals of termination of parental rights is de novo, but we reverse a trial court's decision to terminate parental rights only when it is clearly erroneous.[8] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a distinct and firm conviction that a mistake was made.[9] Grounds for termination of parental rights must be proven by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established.[10] The appellate inquiry is whether the circuit court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous.[11] In resolving the clearly erroneous question, the reviewing court defers to the circuit court because of its superior opportunity to observe the parties and to judge the credibility of witnesses.[12] Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents.[13] Accordingly, the rights of natural parents are not to be passed over lightly; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.[14]
*497 Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child.[15] The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juvenile will be adopted and of the potential harm caused by returning custody of the child to the parent.[16] Only one statutory ground is necessary to terminate parental rights.[17]
Appellant argues on appeal that there was insufficient evidence to support termination of his parental rights because neither DHS nor the attorney ad litem submitted evidence of an order establishing appellant as D.J.'s parent. He argues, essentially, that the failure to enter an order equates to a lack of proof that he was a "parent" of D.J., as required by the statute. We disagree.
Arkansas Code Annotated section 9-27-303(40) defines "parent" to mean a biological mother, an adoptive parent, or a man to whom the biological mother was married at the time of conception or birth or who has signed an acknowledgment of paternity pursuant to § 9-10-120 or who has been found by a court of competent jurisdiction to be the biological father of the juvenile.[18] In Earls v. Arkansas Department of Human Services , our supreme court stated the following with regard to reviewing Arkansas Code Annotated section 9-27-303(40) :
" 'The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language.' ... The basic rule of statutory construction is to give effect to the intent of the legislature. Additionally, in construing any statute, we place it beside other statutes relevant to the subject matter in question and ascribe meaning and effect to be derived from the whole." A plain reading of the applicable statute, Ark. Code Ann. § 9-27-303(40), defining "parent" means that a parent can be biological, or by adoption, or by a man who is married to a biological mother at the time of conception or by a man who has signed an acknowledgment of paternity, or by being found by a court of competent jurisdiction to be the biological father.[19]
While there was no order expressly dedicated to determining that appellant was a parent of D.J., the circuit court stated in its probable-cause order that appellant was to be provided all visitation and services "once a DNA test showing he [was] the biological father of the child was received." It was noted in the circuit court's adjudication order that appellant had been referred for DNA testing and had not participated in services. Its review order stated that appellant had completed DNA testing on August 5, 2016. Again, the circuit court noted therein that services would start once DNA testing confirmed that he is the biological father of D.J. The permanency-planning *498 order stated that appellant's paternity tests had "[come] back" and that appellant was "just now getting going on services." It was in this order that appellant was added as a party and included in the style of the case.
In its fifteen-month permanency-planning order, the circuit court noted testimony from Jones that "DNA testing was completed, then [appellant] did the [other services] after DNA." Finally, in its review hearing/termination of parental rights hearing order, the circuit court stated that DNA results for appellant regarding D.J. were submitted as an exhibit and the document stated that appellant's probability of paternity of D.J. was 99.99 percent. The circuit court also stated therein:
Regarding [appellant], he was putative father of the child at the time the child was taken into care. He was ordered to receive services identical to those offered to Mother. Additionally, he completed a referred DNA test that showed him to be the biological father of the child.
On the basis of these facts, this court cannot find-as appellant argues-that DHS failed to prove or that the circuit court failed to find that appellant was a "parent" of D.J.
Alternatively, appellant argues that DHS failed to offer sufficient proof of the other elements of both the subsequent-factors and aggravated-circumstances grounds rendering granting termination reversible.[20] Again, we disagree.
Though DHS and the attorney ad litem only had to prove one of the three grounds asserted from their joint petition to terminate appellant's parental rights, the circuit court found that they had proven two of the three asserted grounds-the other-subsequent-factors and aggravated-circumstances grounds. Because proof of only one ground was necessary, this court only addresses the other-subsequent factors ground.[21]
D.J. was brought into care on March 4, 2016, pursuant to Garrett's Law due to his and Boyd's testing positive for THC and cocaine at the time of D.J.'s birth; D.J. was adjudicated dependent-neglected for the same reason. Appellant was ordered to stop using drugs in the adjudication order due to his positive test for THC prior to the hearing; this was the first mention of appellant having any issue with drugs. Appellant submitted to hair follicle testing and was positive for cocaine as recent as January 13, 2017, despite testifying at the February 8, 2017 permanency-planning hearing that he had not used illegal substances since August 1, 2016. The circuit court specifically found said testimony to be lacking in credibility given the results of the scientific drug testing. The circuit court also expressed concern that appellant's "lack of availability for random drug screens masks the true nature and extent of his drug usage." Finally, while appellant's drug-and-alcohol assessment had recommended that he attend nine group and nine individual sessions in outpatient treatment, he had only attended three group sessions and two individual sessions in the six months since the recommendation had been made. The appellant's continued use of illegal drugs *499 demonstrated his indifference to remedying the problems that prevented the return of D.J. to his custody.[22] Accordingly, having only become an issue after the filing of DHS's dependency-neglect petition and because of its continuing nature, appellant's drug use is a subsequent factor.
We also note, as did the circuit court, that appellant testified at the February 8, 2017 hearing that he wanted to remain a family unit with Boyd, with whom he had lived for six years. At that same hearing, he was warned by the circuit court that he may have to leave Boyd, if he wants to remain clean and obtain custody of D.J. Because appellant-and Boyd, since they resided in the same home-continued to have positive hair-follicle test results, no trial placement ever occurred. At the time of the termination hearing, appellant was still living with Boyd who-being in the Garrett's Law case, this time with her third child with appellant-was still testing positive for cocaine and only partially complying with the case plan. While the home in which appellant lived was deemed to be "appropriate and safe" by Jones, the circuit court expressly found that it was not safe by virtue either of appellant's drug use or Boyd's drug use, stating regarding the latter that "[e]ven if [appellant] were to become substance-free, he cannot provide a safe and appropriate home for the child as long as the mother lives there." Appellant's inability or unwillingness to separate himself from Boyd is a subsequent factor.
Finally, a parent's failure to comply with court orders can serve as a subsequent factor upon which termination can be based.[23] Appellant was ordered to (1) remain drug free, but continued to have positive drug tests; (2) submit to random drugs screens, but was always unavailable for random screenings;[24] (3) complete the recommendations of the drug-and-alcohol assessment but only partially complied; (4) and submit proof of his attendance at AA/NA meetings, but failed to do so.
The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[25] Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.[26] What matters is whether completion of the case plan achieved the intended result of making the parent capable of caring for the child.[27] We have recognized that a child's *500 need for permanency and stability may override a parent's request to improve his or her circumstances.[28]
Overall, appellant asks this court to reweigh the evidence. This court cannot act as a super fact-finder or second-guess the circuit court's credibility determination.[29] ,[30]
Affirmed.
Gladwin and Murphy, JJ., agree.

Boyd's parental rights to D.J. were terminated in the same order; however, she is not a party to this appeal.

Three other children, Z.J., Da.J., and De.J., were involved in this matter, but were not subjected to the 72-hour hold as Z.J. had resided with the maternal grandmother for five years and Da.J. and De.J. had resided with the paternal grandmother for more than a year. We note that while the affidavit in support of the petition states that Z.J. resides with the maternal grandmother, the circuit court states in its probable-cause order that Z.J. resides with her great-grandmother.

No such order was entered at that time.

Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Supp. 2017).

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) .

Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(A) .

It is not clear whether the "last court date" refers to the February 8, 2017 permanency-planning hearing at which appellant was present or the March 29, 2017 status hearing at which appellant was not present.

Shaffer v. Ark. Dep't of Human Servs. , 2016 Ark. App. 208, at 3, 489 S.W.3d 182, 184 (citing Ullom v. Ark. Dep't of Human Servs. , 340 Ark. 615, 12 S.W.3d 204 (2000) ; Mitchell v. Ark. Dep't of Human Servs. , 2013 Ark. App. 715, 430 S.W.3d 851 ; Brewer v. Ark. Dep't of Human Servs. , 71 Ark. App. 364, 43 S.W.3d 196 (2001) ).

Id. (citing Wade v. Ark. Dep't of Human Servs. , 337 Ark. 353, 990 S.W.2d 509 (1999) ; Knuckles v. Ark. Dep't of Human Servs. , 2015 Ark. App. 463, 469 S.W.3d 377 ; Hopkins v. Ark. Dep't of Human Servs. , 79 Ark. App. 1, 83 S.W.3d 418 (2002) ).

Greenhaw v. Ark. Dep't of Human Servs. , 2016 Ark. App. 294, at 2-3, 495 S.W.3d 109, 111 (citing Hughes v. Ark. Dep't of Human Servs. , 2010 Ark. App. 526, 2010 WL 2522197 ).

Id. at 3, 495 S.W.3d at 111 (citing J.T. v. Ark. Dep't of Human Servs. , 329 Ark. 243, 947 S.W.2d 761 (1997) ).

Houseman v. Ark. Dep't of Human Servs. , 2016 Ark. App. 227, at 3, 491 S.W.3d 153, 155 (citing Brumley v. Ark. Dep't of Human Servs. , 2015 Ark. 356, at 7, 2015 WL 5895440 ; Dinkins v. Ark. Dep't of Human Servs. , 344 Ark. 207, 213, 40 S.W.3d 286, 291 (2001) ).

Friend v. Ark. Dep't of Human Servs. , 2009 Ark. App. 606, at 10, 344 S.W.3d 670, 675 (citing Dowdy v. Ark. Dep't of Human Servs. , 2009 Ark. App. 180, 314 S.W.3d 722 ).

Johnson v. Ark. Dep't of Human Servs. , 2016 Ark. App. 412, at 6-7, 501 S.W.3d 391, 395 (citing Oldham v. Ark. Dep't of Human Servs. , 2015 Ark. App. 490, at 6-7, 469 S.W.3d 825, 829 ).

Id. at 2, 491 S.W.3d at 155 (citing Harbin v. Ark. Dep't of Human Servs. , 2014 Ark. App. 715, at 2, 451 S.W.3d 231, 233 ).

Id. (citing Ark. Code Ann. § 9-27-341(b)(3)(B), (b)(3)(A) (Repl. 2015); Harbin , supra ).

Beard v. Ark. Dep't of Human Servs. , 2016 Ark. App. 467, at 7, 503 S.W.3d 89, 93 (citing Sanford v. Ark. Dep't of Human Servs. , 2015 Ark. App. 578, 474 S.W.3d 503 ).

Ark. Code Ann. § 9-27-303(40) (Supp. 2017).

2017 Ark. 171, at 10-11, 518 S.W.3d 81, 87-88.

Appellant makes no argument with regard to the circuit court's best interest findings; therefore, we affirm if at least one statutory ground is proven. Del Grosso v. Ark. Dep't of Human Servs. , 2017 Ark. App. 305, at 5, 521 S.W.3d 519, 522 (a failure to challenge the best-interest finding waives the issue on appeal.).

See Taylor v. Ark. Dep't of Human Servs. , 2016 Ark. App. 453, at 8, 503 S.W.3d 813, 818 (citing Fenstermacher v. Ark. Dep't of Human Servs. , 2013 Ark. App. 88, 426 S.W.3d 483 ).

Id. (citing Carroll v. Ark. Dep't of Human Servs. , 85 Ark. App. 255, 148 S.W.3d 780 (2004) ).

Bynum v. Ark. Dep't of Human Servs. , 2017 Ark. App. 471, at 12, 528 S.W.3d 859, 868 (citing Miller v. Ark. Dep't of Human Servs. , 2017 Ark. App. 396, 525 S.W.3d 48 ; Clements v. Ark. Dep't of Human Servs. , 2013 Ark. App. 493, 2013 WL 5273040 ).

He was only screened at his scheduled visitations with D.J.

Sarut v. Ark. Dep't of Human Servs. , 2015 Ark. App. 76, at 7, 455 S.W.3d 341, 346 (citing Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2013) ).

Id. (citing Schaible v. Ark. Dep't of Human Servs. , 2014 Ark. App. 541, at 8, 444 S.W.3d at 371 ; Ford v. Ark. Dep't of Human Servs. , 2014 Ark. App. 226, at 3, 434 S.W.3d 378 ).

Davis v. Ark. Dep't of Human Servs. , 2009 Ark. App. 815, at 11, 370 S.W.3d 283, 288 (citing Wright v. Ark. Dep't of Human Servs. , 83 Ark. App. 1, 115 S.W.3d 332 (2003) ).

Arnold v. Ark. Dep't of Human Servs. , 2013 Ark. App. 260, at 7, 427 S.W.3d 165, 168 (citing Henderson v. Ark. Dep't of Human Servs. , 2010 Ark. App. 191, 377 S.W.3d 362 ).

Dunbar v. Ark. Dep't of Human Servs. , 2016 Ark. App. 472, at 12, 503 S.W.3d 821, 828-29 (citing Lynch v. Ark. Dep't of Human Servs. , 2012 Ark. App. 149, 2012 WL 474807 ).

Appellant also makes the argument before this court that DHS failed to provide him appropriate services in a timely fashion. He did not make this argument below. Because appellant failed to challenge the reasonable-efforts finding in the permanency-planning order, he has waived the issue for purposes of appeal. Cheney v. Ark. Dep't of Human Servs. , 2012 Ark. App. 209, at 11, 396 S.W.3d 272, 278 (citing Anderson v. Ark. Dep't of Human Servs. , 2011 Ark. App. 526, 385 S.W.3d 373 ).