BRANDON J. HARRISON, Judge
Leon Harris appeals the circuit court's order terminating his parental rights to his daughter, L.W. On appeal, he argues that the circuit court erred in (1) denying him reasonable accommodations in accordance with the Americans with Disabilities Act (ADA) and (2) finding that he had not remedied his drug issues. We affirm.
On 18 July 2016, the Arkansas Department of Human Services (DHS) petitioned for emergency custody of five-day-old L.W. DHS identified Tonia Wysong as L.W.'s mother and Harris as the putative father. The accompanying affidavit explained that when L.W. was born, both she and Wysong tested positive for cocaine and tricyclites. Wysong admitted to having used cocaine "about a month ago" but said that it was a "one-time deal." Wysong identified Harris as her fiancé and L.W.'s father. Two days after L.W. was born, Wysong tested positive for cocaine, oxycodone, and benzodiazepine. Harris was interviewed and said he was not on drugs and would like to be L.W.'s caregiver. DHS exercised an emergency seventy-two-hour hold on L.W. for neglect (newborn illegal-substance exposure) and maternal unfitness.
The court approved emergency custody of L.W. and found probable cause to continue custody with DHS based on Wysong's written stipulation. At that time, Wysong identified a different man as the putative father, and Harris was excused from the proceedings. However, in the adjudication order, the court again identified Harris as the putative father and ordered him to take appropriate steps to resolve the issue of paternity. L.W. was adjudicated dependent-neglected due to neglect and parental unfitness by the mother.
A November 2016 review order noted that Wysong no longer wanted to participate in the case and wished to consent to termination of her parental rights. In January 2017, the court noted that DHS had petitioned to terminate Wysong's parental rights; the court also found that Harris's paternity test results had not yet been received, but if Harris was the biological father, DHS was to conduct a home study.
An April 2017 order terminated Wysong's parental rights and found Harris was L.W.'s biological father. The court ordered that visitation commence between Harris and L.W. The court convened a permanency-planning hearing in June 2017 and authorized a plan to place custody with Harris and a concurrent goal of adoption. The court noted that Harris had consistently exercised visitation with L.W. and had submitted to random drug screens biweekly but had tested positive for cocaine in March 2017. Harris also had a *781 home study done and had completed parenting classes.
In July 2017, the circuit court reviewed the case and found that Harris was in partial compliance with the case plan and court orders. The court found that
although he completed a drug and alcohol assessment, there are concerns regarding the truthfulness of the information he provided during the assessment. He tested positive for cocaine on the drug screen that was administered during a brief recess in today's hearing. However, he believes his prescription medication is making him test positive for cocaine. He has been visiting the juvenile and his interaction during visits is appropriate. He also participates in GIFT [Guided Interaction Family Therapy] Coaching, and has maintained stable housing and income.
The court found that L.W. could not be placed with Harris at that time and that L.W. "needs to be in the custody of a parent who is not using or abusing illegal substances or medications not prescribed for that parent."
In September 2017, the court entered another review order finding that Harris was "making very little progress in the plan to have the juvenile placed in his legal custody." The court again expressed concern with Harris's truthfulness on his drug-and-alcohol assessment and also expressed concern with Harris's continued contact with Wysong and Tammie Barnes, a former fiancée, "both of whom are drug users. There is not a plan in place for him to parent this child and keep her safe when she is with him alone. That is not good and that is scary." The court also noted that during visitation with L.W., Harris "sits on the floor with her to play with toys and to eat a snack. The juvenile is very active during visitation, and tries to leave the room throughout the visit. However, father shakes her snack bowl and tells her to come back when she runs off instead of keeping her confined." Finally, the court stated that Harris had "completed GIFT Coaching to address parenting and the development of routines around his physical limitations and the juvenile's care."
The court convened a two-day review hearing on October 19 and 25. At the commencement of the hearing, both DHS and L.W.'s attorney ad litem requested that the court change the goal of the case to adoption and authorize DHS to file a petition to terminate parental rights. Alexandria Forte, the family service worker assigned to the case, testified that since the last hearing, Harris had been compliant with the case plan and court orders. She agreed that Harris received Social Security disability as income, that he was participating in substance-abuse counseling, and that his drug-and-alcohol assessment recommended outpatient drug treatment. Forte explained that a hair-shaft test completed on September 12 had been positive for hydrocodone, cocaine, and benzoylecgonine. A urine screen performed on October 2 was negative.
She explained that Harris was still exercising visitation and that the visits were appropriate, although she noted Harris's habit of sometimes shaking snacks at L.W. to get her to come back to him instead of getting up to retrieve her. The program assistants in the room during visitation alerted Forte that it seemed inappropriate. Forte explained that Harris had been referred to individual counseling but that he did not feel he needed it. Finally, she agreed that Harris's home was appropriate but stated that DHS was nevertheless recommending termination because he had just recently admitted he had a drug problem. Harris had also said that he was around people who do drugs and that he *782 had gotten drugs in his system while purchasing drugs for someone else. For those reasons, DHS felt it was a hazardous environment for L.W.
On cross-examination, Forte agreed that Harris is disabled and requires a walker. She also agreed that if someone is disabled and seeking custody of his or her child, DHS is obligated to individually tailor DHS services for the disabled parent. Forte explained that DHS had offered to provide a smaller room for Harris's visitation with L.W. but he declined the offer. In the larger visitation room, there are assistants who are supervising the visits and will step in if things get out of hand. She disagreed that DHS was obligated to suggest to Harris that he sit in a chair instead of on the floor now that L.W. is active; Forte stated, "I think he has to use his own judgment regarding whether he should sit in a chair or on the floor when he's visiting with his daughter. ... He is looking to gain custody of his daughter. If he cannot do it within a DHS office and he needs our assistance then, how will he do it at the house?" Forte said that she was not familiar with the requirements of the ADA but that Harris had been provided GIFT coaching, which is parenting classes that cater to his needs specific to his disability.
Harris testified that he had last used cocaine sometime around 1995 but that he had been around cocaine as recently as six months ago. He said he had last spoken to Wysong in July or August 2017 and that he was no longer in a relationship with Barnes, although she was pregnant with his child. Harris agreed that he needed some type of special accommodation to handle L.W.'s activity and suggested that he be allowed to close the door to the smaller visitation room. He also said that he had spoken to Forte about someone sitting inside the visitation room. When asked if DHS refused that request, Harris replied, "Well, it never happened." He later clarified that DHS had not refused to have someone sit in the room but that they also did not close the door.
On cross-examination, Harris explained that Wysong had contacted him to ask for money and that he did not initiate contact. He also stated that he was physically disabled from a gunshot injury nine years ago and that he receives Social Security disability income. He acknowledged that he received GIFT coaching because of his physical disability and said that the GIFT coaching had been helpful.
In its review order, the circuit court found that placing custody with a parent was no longer an appropriate plan and changed the goal of the case to adoption. The court cited Harris's continuing drug use and specifically found Harris not credible about his use of cocaine. The court also found that
the father's disability itself does not prevent him from being able to provide for the juvenile's needs. However, the father seems to focus more on what DHS does not do for him than the efforts he can make, with his physical limitations, to demonstrate he can be the fit parent this juvenile's [sic] needs. The Court also points out that it is father's cocaine use, the denial of that cocaine use, purchasing cocaine for a family member, being around friends and family members who use cocaine all pose a great risk for the juvenile's safety and well-being. Father's physical limitation, together with his lifestyle of purchasing cocaine, being around others who use cocaine, and likely using cocaine himself, pose serious risks to the juvenile's safety.
Finally, the court found that DHS had made reasonable efforts to provide family services, including services that addressed Harris's needs due to his disability.
*783 On 17 November 2017, Harris filed a motion for accommodations, arguing that other than GIFT coaching, he had not been provided or offered additional occupational therapy to assist him with effectively caring for his daughter. He asserted that he was being denied the benefits of government services to which he is entitled under the ADA.
DHS petitioned to terminate Harris's parental rights on November 27, and the circuit court convened a hearing on 24 January 2018. The court first addressed Harris's motion for accommodations. Danielle Kimbrough, the DHS caseworker, explained that a family-team meeting was held in December 2017 and that she specifically asked Harris what accommodations DHS could make for him during visitation. Harris's response was that he did not need any accommodations. Kimbrough also said that she had discussed occupational therapy with Harris, and "it came down to he was supposed to contact St. Vincent's Hospital, where he received occupational therapy when he first got injured, to see if they can provide some more occupational therapy. And I also called other providers to see if they could do OT for Mr. Harris." Kimbrough also reiterated that DHS had offered Harris a smaller visitation room, but he did not take advantage of that. Harris confirmed that he had discussed starting occupational therapy again and stated that he did not need DHS's assistance because it was covered by his insurance.
After hearing testimony and arguments from counsel, the circuit court found that DHS had made reasonable accommodations under the ADA and that the case would proceed to termination. Danielle Kimbrough was recalled and testified that she had been the caseworker for L.W.'s case since September 2017. She said that L.W. was placed in a licensed foster home and that she was doing well. Kimbrough stated that DHS had offered Harris services in the form of visitation, family counseling, and a drug-and-alcohol assessment. She said that Harris had been cooperative in getting services completed but that he had not been truthful about his addiction. She explained that he had tested positive for cocaine in March 2017, July 2017, and September 2017. Kimbrough expressed that Harris had credibility issues because he had lied in his drug-and-alcohol assessment and lied in court about his drug use. She opined that there was a "strong chance" that Harris's drug use would continue even if L.W. was placed in his home. She also expressed concern over Harris's continued contact with Wysong and Barnes, his former fiancée, because both women have drug problems. In her opinion, continuing to offer services to Harris would not result in L.W. being placed with him within a time frame consistent with her needs.
Angela Brown, an adoption specialist, testified that L.W. was adoptable and that a data-matching search resulted in 575 potential adoptive families.
Harris testified that he had last used an illegal substance, cocaine, in August 2017. He said that he had not knowingly lied to anyone about his drug use but agreed that it was possible that he had "gotten confused a few times." He admitted that he had made a mistake in using again but said that he was doing his best to do what DHS was asking him to do. He was attending meetings, trying to stay positive, and no longer associating with people who do drugs. He conceded that he was not ready to take L.W. home that day and that he needed some additional occupational therapy.
At the end of the hearing, the court found that DHS had proved two statutory grounds for termination: the "subsequent *784 factors" ground and the "aggravated circumstances" ground. See Ark. Code Ann. § 9-27-341(b)(3)(B)(vii) & (ix)(a)(3) (Supp. 2017). The court's written order made the following findings:
[T]he court knows Mr. Harris loves his child, but love is not enough to be a fit parent for a child. Mr. Harris is not credible about his drug use and other testimony he has given in this case. While the Court can say that Mr. Harris has not been maliciously untruthful-the Court can and will say that he has been willfully deceitful. ... Father likes to live on the edge of drug activity and drug use, and to be around people who use drugs. He had a relationship with the biological mother and with his former fiancé[e], both of whom used drugs. He handled drugs for others just a few months ago. He now admits he used drugs in August 2017, when he handled drugs around that time. The Court does find father credible about this-that he has lied before. The Court further finds father was not credible when he testified today that he is telling the truth about his drug use; however, his testimony was credible when he testified that he is not ready to take the juvenile home today, as he needs more therapy.
It is clear that, despite the offer of services designed to place [L.W.] in her father's custody, he has shown the incapacity and indifference to rehabilitate the circumstances that prevent placement of [L.W.] in his custody. He is not a fit parent; he is an unfit parent. It is also painfully clear that there is little likelihood that services to the family will result in successful reunification. Therefore, the Court makes a finding of aggravated circumstances.
The court concluded that L.W. needs permanency and "deserves a parent or parents who are fit, are free from using illegal substances, and who will not expose her to the dangers of being around illicit drug use; placing [L.W.] in the custody of her father will put her at risk of harm." The court also found that L.W. is adoptable. Thus, termination of Harris's parental rights was in L.W.'s best interest. Harris has timely appealed this order.
In appeals involving the termination of parental rights, our standard of review is de novo. Johnson v. Ark. Dep't of Human Servs. , 2018 Ark. App. 221, 547 S.W.3d 489. DHS must prove allegations by clear and convincing evidence, which is proof that will produce in the fact-finder a firm conviction that the allegation has been established. Cotton v. Ark. Dep't of Human Servs. , 2012 Ark. App. 455, 422 S.W.3d 130. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Johnson , supra. We will not reverse unless the circuit court's findings are clearly erroneous, giving due regard to the court's opportunity to judge the credibility of the witnesses. Cotton , supra. A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence, we are left with a definite and firm conviction that a mistake has been made. Id. The termination of parental rights is an extreme remedy and in derogation of the natural rights of parents. Johnson , supra. Accordingly, the rights of natural parents are not to be passed over lightly; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Id.
The termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. Johnson , supra. The first step requires proof of one or more statutory grounds for termination; the second step, *785 the best-interest analysis, includes consideration of the likelihood that the juvenile will be adopted and of the potential harm caused by returning custody of the child to the parent. Id. Only one statutory ground is necessary to terminate parental rights. Id.
For his first point, Harris argues that the circuit court erred in denying him reasonable accommodations in accordance with the ADA. Arkansas Code Annotated section 9-27-341(b)(3)(B) provides that a circuit court may terminate parental rights if it finds by clear and convincing evidence:
(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity of indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.
(b) The department shall make reasonable accommodations in accordance with the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., to parents with disabilities in order to allow them meaningful access to reunification and family preservation services.
Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) & (b) (Supp. 2017). Parental rights may also be terminated if the court finds that the parent has subjected the juvenile to aggravated circumstances, which includes a determination by a judge that there is little likelihood that services to the family will result in successful reunification. Id. at (ix)(a)(3).
The ADA defines a "disability," in part, as a physical or mental impairment that substantially limits one or more major life activities of such individual, and "major life activities" include walking, standing, and performing manual tasks. 42 U.S.C. § 12102(1) & (2)(A) (2018). "Auxiliary aids and services" are defined as
(A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
(B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;
(C) acquisition or modification of equipment or devices; and
(D) other similar services and actions.
Id. at 12103(1).
On appeal, Harris argues that DHS failed to make, and the circuit court failed to order, reasonable accommodations to allow him meaningful access to reunification and family-preservation services. He suggests that a reasonable accommodation would have been an auxiliary parent aide to assist during visitation or a trial placement in his home so he could demonstrate how he would contain L.W. while she was small and mobile. He asserts that without these reasonable accommodations, neither of the statutory grounds relied on by the circuit court is supported by clear and convincing evidence because both grounds require either meaningful access to appropriate family services (subsequent factors) or a demonstration that an additional service would not have likely resulted in reunification (aggravated circumstances).
DHS responds that Harris's argument does not compel reversal of the termination.[1] First, the circuit court terminated *786 Harris's rights based on two statutory grounds, subsequent factors and aggravated circumstances, and the aggravated-circumstances ground does not require a finding of "meaningful services." Second, even if DHS did fail to provide reasonable accommodations under the ADA, it would not compel reversal of the termination. See J.T. v. Ark. Dep't of Human Servs. , 329 Ark. 243, 257, 947 S.W.2d 761, 768 (1997) (holding that a failure to make reasonable accommodations would not negate a circuit court's decision to terminate parental rights because a "parent's rights under the ADA must be subordinated to the protected rights of the child."). DHS asserts that the record shows it did make efforts to provide Harris with services-including GIFT coaching that was tailored to his disability-but Harris failed to benefit from the services or to implement what he had learned. DHS also notes that there is no record of any specific reasonable accommodation that was requested by Harris and denied; Harris made only vague and general assertions below that DHS had not accommodated his disability. His suggestion that an "auxiliary parent aide" would have been appropriate is raised for the first time on appeal; in addition, DHS points out that a personal aide such as that is not covered by the definition of "auxiliary aids and services." Finally, DHS disputes that this accommodation would have changed the course of the case and that Harris is essentially asking this court to reweigh the evidence.
We hold that the circuit court did not err in finding that DHS had made reasonable efforts to provide family services, including services that addressed Harris's needs due to his disability. There was no specific accommodation that Harris requested that was denied. He never requested the "auxiliary parent aide" that he suggests on appeal, and the case never progressed to the point at which an at-home trial placement was feasible. Finally, there is no indication that any additional services would have changed the outcome of the case or made it more likely for L.W. to be placed in Harris's custody. We therefore affirm on this point.
For his second point, Harris argues that the circuit court erred in finding that he had not remedied his drug issues. Harris contends that the evidence did not support a finding that he was not "free from illegal substances" and that the circuit court "ignored other crucial evidence demonstrating [his] sobriety after August 2017." Harris notes his negative drug screens for five months prior to the termination hearing, his "very few" positive drug screens during the case, and his diligence in working the case plan and faithfully exercising visitation. Harris concludes that there was insufficient evidence to support the court's finding that he had failed to remedy his drug issues or that he was incapable of benefiting from further reunification services. For the same reason, he argues, the court's potential-harm finding is likewise unsupported by the evidence. Harris asserts that the circuit court "simply speculated that [he] would expose L.W. to a drug lifestyle" and that placing L.W. in his care would put her at risk of harm.
In response, DHS recounts the circuit court's ongoing concern with Harris's truthfulness regarding his drug use and his positive tests for cocaine in March, July, and September 2017. And even while denying drug use, Harris admitted being around others using drugs and picking up cocaine for someone else. In October 2017, Harris admitted having a cocaine addiction, seven months after he had been identified as L.W.'s biological father and *787 fifteen months after L.W. had been placed in DHS's custody. DHS concludes:
At the time of the termination of Harris's parental rights, L.W. had been in foster care for nearly 18 months. Harris had approximately 10 of these 18 months to convince the court that he had resolved his drug abuse issues and no longer associated with drug users, but he never reached a point where L.W. could be returned to his custody, even as a trial placement, due to positive drug tests, admissions to associating with drug users, and issues with his credibility.
We hold that the circuit court did not clearly err in finding that Harris had not remedied his drug issues. Harris tested positive for cocaine three times after he had been identified as L.W.'s biological father and a case plan was put in place with the goal of placing L.W. in his custody. In addition, the circuit court found that Harris had not been credible or truthful regarding his drug use or affiliations with drug users. Appellate courts defer to the circuit court's credibility determinations, and in matters involving young children's welfare, give great weight to their observations. Osborne v. Ark. Dep't of Human Servs. , 98 Ark. App. 129, 252 S.W.3d 138 (2007). This reasoning supports both the circuit court's findings on the statutory grounds and its potential-harm finding. Therefore, we affirm.
Affirmed.
Virden and Klappenbach, JJ., agree.

DHS and L.W.'s attorney ad litem filed a joint brief, but for simplicity's sake, we refer to appellee as "DHS."